STATE OF NORTH CAROLINA v. JOSEPH OSMAR JONES

No. COA00-1182

(Filed 18 December 2001)

**1. Confessions and Incriminating Statements— juvenile— right to be questioned with a guardian present**

The trial court did not err in a first-degree murder, first-degree sexual offense, and first-degree kidnapping case by denying a thirteen-year-old defendant's motion to suppress a statement he made to police during questioning even though defendant contends that his aunt was not his guardian under the law and therefore his juvenile right to be questioned with a guardian present under N.C.G.S. § 7A-595 was allegedly violated, because: (1) the aunt acted as a guardian since she was responsible for the defendant and he was dependent upon his aunt for room, board, education, and clothing; and (2) although the aunt may have had a conflict of interest since her brother was a coparticipant, an officer testified that the aunt did not intimidate defendant, twice encouraged defendant to tell the truth, and acted like a natural concerned parent.

**2. Confessions and Incriminating Statements— juvenile—voluntariness—waiver**

The trial court did not err in a first-degree murder, first-degree sexual offense, and first-degree kidnapping case by denying a thirteen-year-old defendant's motion to suppress a statement he made to police during questioning even though defendant contends he was not afforded all statutory procedural protections during his interrogation by the police, because the evidence reveals that defendant knowingly and intelligently waived his rights based on the facts that: (1) defendant made good grades in school and had the level of intelligence necessary to effect a knowing and intelligent waiver of his rights; and (2) the warnings defendant received complied with the requirements of Miranda.

**3. Evidence— expert opinion testimony—belief that victim would not have consensual sex with defendant before the murder**

The trial court did not err in a first-degree murder, first-degree sexual offense, and first-degree kidnapping case by admit-

ting the expert opinion testimony of a doctor stating that she did not believe the ten-year-old victim would have had consensual sex with the thirteen-year-old defendant the day before her murder, because: (1) defendant has not clearly identified the evidence which he finds improper and has not assigned plain error to this assignment of error on appeal; (2) defendant's two trial objections failed to attack the foundation or substance of the doctor's testimony; and (3) the doctor properly testified under N.C.G.S. § 8C-1, Rule 705 since she examined the victim's medical records, autopsy photographs, autopsy report, and reviewed a family history taken from the victim's grandmother.

**4. Homicide; Kidnapping; Sexual Offenses— first-degree— sufficiency of evidence**

The trial court did not err in a first-degree murder, first-degree sexual offense, and first-degree kidnapping case by denying defendant's motion to dismiss the charges, because the State presented sufficient evidence to be submitted to the jury on each of the charges.

**5. Juveniles— transfer—juvenile court to superior court— probable cause**

The trial court did not err in a first-degree murder, first-degree sexual offense, and first-degree kidnapping case by transferring the case from juvenile court to superior court even though defendant contends his transfer was allegedly based on improperly admitted evidence including his statement to police, because: (1) defendant's motion to suppress his statement was properly denied; (2) the trial court properly concluded under N.C.G.S. § 7A-608 that probable cause existed to show that defendant committed a Class A felony (first-degree murder), and the trial court automatically acquired jurisdiction over the first-degree kidnapping and first-degree sexual offense charges since they arose out of the same act or transaction as the murder; and (3) there can be no appellate review of a mandatory transfer done under N.C.G.S. § 7A-608.

Judge BIGGS concurring in result with separate opinion.

Appeal by defendant from judgment entered 23 February 2000 by Judge E. Lynn Johnson in Cumberland County Superior Court. Heard in the Court of Appeals 13 September 2001.

**STATE v. JONES**

[147 N.C. App. 527 (2001)]

*Attorney General Roy Cooper, by Assistant Attorney General John G. Barnwell, for the State.*

*Miles and Montgomery, by Mark D. Montgomery, for defendant appellant.*

McCULLOUGH, Judge.

Defendant Joseph Osmar Jones was tried before a jury at the 14 February 2000 Criminal Session of Cumberland County Superior Court after being charged with one count of first degree murder, two counts of first degree sexual offense, and one count of first degree kidnapping. Evidence for the State showed that defendant Jones lived with his sixteen-year-old uncle, Harold Jones, and his aunt, Al-Neisa Jones, in a house in Burlington, North Carolina. Harold and Al-Neisa Jones are brother and sister. Harold Jones' girlfriend, Dorthia Bynum, aged seventeen, also stayed at the house from time to time. Defendant, Harold Jones and Dorthia Bynum knew ten-year-old Tiffany Long, who lived nearby with her grandmother. At all times relevant to this appeal, defendant was thirteen years old.

On 16 October 1998, Tiffany telephoned her grandmother around 3:30 p.m. and got permission to visit a neighborhood friend. When Mrs. Long returned from work around 6:00 p.m., Tiffany was not at home. Mrs. Long contacted several people in the neighborhood in an effort to locate her granddaughter. Many of the children later testified they saw Tiffany with defendant during the afternoon, and that the two were walking toward 614 Lakeside Avenue, where defendant, Harold Jones, and Dorthia Bynum used to live. Mrs. Long's efforts to locate Tiffany failed, so she called the police around 8:00 p.m.

After a police search of the area, Tiffany Long's body was discovered under a heavy cloth in the backyard of 614 Lakeside Avenue. A TV cable was looped around her neck, and her shirt was stained with fecal matter. S.B.I. Crime Scene Specialist William Lemons found a pool of blood in the right front bedroom and drag marks in the house and on a path outside the house. He found a backpack purse by the back porch, later identified as Tiffany's, which contained, among other things, church "bus bucks," candy, an earring, and a note which read "Dorthia loves Harold." Agent Lemons found a blue and white coat and a pair of panties outside the fence of the backyard, as well as a bloody bed rail. Agent Lemons also noted the presence of footprints and bicycle tire tracks in the blood trail.

**STATE v. JONES**

[147 N.C. App. 527 (2001)]

Examination of Tiffany's corpse showed that she had lacerations on her head, wounds from the back of her head down to her skull, and ligature marks around her neck, which indicated strangulation. Dr. John Butts, the Chief Medical Examiner of North Carolina and an expert in forensic pathology, determined that the cause of Tiffany's death was "blows to the head that broke, cracked the skull, caused bruising and bleeding over the brain and within the brain." He also opined that the lacerations on Tiffany's head were caused by a heavy object with a narrow edge. Additionally, Tiffany's vagina and rectum showed signs of trauma.

A pubic hair with an attached root was recovered from Tiffany's body, and examination determined that the DNA matched that of defendant. A pair of light blue Tommy Hilfiger jeans seized from defendant's bedroom had blood stains; testing revealed that the blood was Tiffany's.

After discovering Tiffany Long's body, the police interviewed many witnesses, who stated that they saw defendant wearing the light blue jeans at a local park on 16 October 1998. Witnesses also saw Dorthia Bynum and Harold Jones at the park that day. On 17 October 1998, Al-Neisa Jones consented to a police search of her apartment. Police seized a black t-shirt believed to have been worn by defendant, as well as defendant's bicycle, the light blue Tommy Hilfiger jeans, and a pair of boxer shorts. The clothing appeared to have fecal matter on them, and that suspicion was later confirmed by Dr. Butts' investigation.

Defendant was interviewed but not taken into custody at the police station on 17 October 1998. After the interview he went home with his aunt, Al-Neisa Jones. During the interview, defendant stated that he had not seen Tiffany Long on 16 October 1998, nor had he been at 614 Lakeside Avenue, his previous home. When asked where he was during the evening hours of 16 October 1998, defendant said he attended a football game.

On 19 October 1998, a teacher alerted police that Dorthia Bynum made comments about Tiffany Long being killed by a TV cable cord. As this information had not been made public, the police suspected her of perpetrating the crime. She was taken into custody and gave a statement; she was then charged with first degree murder, first degree kidnapping, and first degree sexual offense.

On 21 October 1998, defendant was taken into police custody and interviewed in the presence of his aunt. He was advised of his rights

both orally and in writing; he waived his rights and stated that he fully understood them. Defendant gave a statement, which was re-read to him sentence by sentence. Upon reviewing it, he signed it. In the statement, defendant said he brought Tiffany to 614 Lakeside Avenue after being requested to do so by Dorthia Bynum. Once there, he admitted to placing his penis in Tiffany's rectum and being present when Tiffany was hit on the head with the bed rail. He also stated that he helped drag Tiffany's body outside and threw the bed rail over the fence in the backyard. He stated that Dorthia Bynum and "Fat Boy" were participants in the murder. He also indicated that "Fat Boy" sodomized Tiffany, causing her to defecate. According to defendant, "Fat Boy" then strangled her with the TV cable, and hit her repeatedly on the head with the bed rail.

After the police interview, defendant was charged with one count of first degree murder, two counts of first degree sexual offense, and one count of first degree kidnapping. On 23 November 1998, the trial court held a hearing to determine whether defendant should be transferred to the superior court for trial as an adult. At the conclusion of the hearing, the trial court found probable cause to believe defendant committed a Class A felony (first degree murder), and signed an order transferring defendant to superior court for trial as an adult, pursuant to N.C. Gen. Stat. § 7A-608 (1995).

On 25 November 1998, defendant appealed the trial court's decision to transfer him to superior court. On 30 November 1998, defendant filed a petition for writ of supersedeas under Rule 23 and a motion for a temporary stay to delay execution of the trial court's transfer order. On 30 November 1998, this Court denied defendant's motion for a temporary stay and stated that a ruling on the petition for writ of supersedeas would be made "upon the filing of a response to the petition or the expiration of the time for the filing of a response, if none is filed."

The State filed a motion to dismiss defendant's appeal on 16 December 1998; this Court denied the motion on 18 December 1998. Defendant's petition for writ of supersedeas was denied on the same date. Subsequently, on 7 September 1999, defendant was indicted on one count of first degree murder, two counts of first degree sexual offense, and one count of first degree kidnapping.

The trial court conducted a suppression hearing on 29 November 1999 to evaluate defendant's waiver of his *Miranda* rights and his rights under N.C. Gen. Stat. § 7A-595 (1995). On 30 November 1999,

the trial court determined that none of defendant's rights under N.C. Gen. Stat. § 7A-595, N.C. Gen. Stat. Chapter 15, or the federal or state constitutions were violated. The trial court also found that defendant's aunt was his "guardian" under N.C. Gen. Stat. § 7A-595, and that she was present during his interrogation. Defendant's motion to change venue from Alamance County to Cumberland County was granted, and defendant's jury trial took place at the 14 February 2000 Criminal Session of Cumberland County Superior Court.

During its presentation of evidence, the State called twenty-seven witnesses, including Tiffany's grandmother. Mrs. Long testified that Tiffany was not interested in boys and that she bathed every day, thereby rebutting defendant's claim that his pubic hair got on Tiffany's body the day before she died. The State extracted voluminous testimony from neighborhood witnesses who saw defendant with Tiffany Long the day of her death, and then presented several law enforcement officers who investigated the murder. The jury also heard testimony from Dr. John Butts, the State's Chief Medical Examiner, who performed the autopsy on Tiffany Long's body.

Defendant was the sole defense witness called to testify. He testified on his own behalf and stated that Dorthia Bynum told him to bring Tiffany to the Lakeside Avenue house because she had to talk to her. Defendant denied that he sexually assaulted Tiffany, but did state that Harold Jones sodomized her. Defendant said he was present when Tiffany was murdered, but maintained that Dorthia, not Harold, performed the murder. Defendant said he covered up for Harold because he wanted to keep him out of trouble. He repudiated parts of his earlier statement to police and admitted lying to the police during previous conversations. Defendant also testified he had consensual sex with Tiffany on 15 October 1998, which accounted for his pubic hair being on her body.

During the rebuttal stage of the trial, the State called Dr. Sharon Cooper, an expert in developmental and forensic pediatrics, to testify about her knowledge of Tiffany Long's medical records and her behaviors. Dr. Cooper testified that Tiffany appeared to have been sexually abused in the past, as she did not have a hymen and had not had one for some time. Dr. Cooper then discussed sexual abuse and its effect on children in general, as well as the impact such abuse had on Tiffany Long before her death.

On 23 February 2000, defendant was found guilty of one count of first degree murder, two counts of first degree sexual offense, and

first degree kidnapping. Defendant was sentenced to life in prison without parole for the first degree murder verdict, and to 300-369 months' imprisonment for the other crimes. Defendant appealed.

On appeal, defendant argues that the trial court erred by (I) denying his motion to suppress his statement, as a violation of his right to avoid self-incrimination under the federal and state constitutions; (II) admitting the testimony of Dr. Sharon Cooper; (III) denying his motion to dismiss; and (IV) transferring the case from juvenile court to superior court. For the reasons set forth, we disagree with defendant's arguments and find no error in his conviction.

Initially, we note that this case arose when our State's Juvenile Code was codified as Chapter 7A of the North Carolina General Statutes. The entire Juvenile Code underwent extensive revision and was renumbered as Chapter 7B of our General Statutes, effective 1 July 1999. 1998 N.C. Sess. Laws ch. 202. The offense was committed in October 1998, prior to the effective date of the revisions. Hence, all references herein will be to statutory provisions in effect in 1998.

## I. Motion to Suppress

[1] Defendant first argues that the trial court erred in denying his motion to suppress the statement he made to police during questioning. Defendant's main argument is that his aunt, Al-Neisa Jones, was not his "guardian" under the law and that his juvenile right to be questioned with a guardian present was violated, making his waiver of his juvenile rights ineffective and his statement inadmissible as a matter of law. Defendant argues that Ms. Jones was only a person with whom he lived, and that she had a serious conflict of interest because her brother, Harold Jones, was also charged with the victim's murder.

In considering this assignment of error, we note that the stated purpose of the juvenile code is

> [t]o develop a disposition in each juvenile case that reflects consideration of the facts, the needs and limitations of the child, the strengths and weaknesses of the family, and the protection of the public safety[.]

N.C. Gen. Stat. § 7A-516(3) (1995).

### (1) The Definition of "Guardian"

Under N.C. Gen. Stat. § 7A-595, a juvenile must be informed of his rights before being interrogated; these rights include having a "par-

ent, guardian, or custodian" present and the right to an attorney. If the child is under fourteen, as defendant was, the rights afforded are even greater. A juvenile defendant under fourteen must be interrogated only in the presence of his "parent, guardian, custodian, or attorney." *See* N.C. Gen. Stat. § 7A-595(b).

Defendant argues that his aunt did not fall under any of the four categories enumerated by N.C. Gen. Stat. § 7A-595(b). He argues that she was, at most, his caretaker or one who stood *in loco parentis* to him. Based on the facts of the case, it is clear that Al-Neisa Jones was neither defendant's natural parent nor his attorney. Ms. Jones was also not defendant's custodian. N.C. Gen. Stat. § 7A-517(11) (Cum. Supp. 1998) defines a custodian as "[t]he person or agency that has been awarded legal custody of a juvenile by a court." *Id.* Because Al-Neisa Jones was never technically awarded legal custody of defendant by a court, she does not qualify as his "custodian." Thus, we must now consider whether Ms. Jones qualifies as defendant's "guardian."

Our examination of the term "guardian" begins in the Juvenile Code. N.C. Gen. Stat. § 7A-517, entitled "Definitions," does not define the term "guardian." Nonetheless, there are helpful points of reference to which we turn. For example, Black's Law Dictionary defines a "guardian" as

> [a] person lawfully invested with the power, and charged with the duty, of taking care of the person and managing the property and rights of another person, who, for defect of age, understanding, or self-control, is considered incapable of administering his own affairs. One who legally has responsibility for the care and management of the person, or the estate, or both, of a child during its minority.

Black's Law Dictionary 706 (6th ed. 1990).

Despite its failure to define the term "guardian," the Juvenile Code does explore the situation in which the trial court must appoint a guardian for a juvenile. N.C. Gen. Stat. § 7A-585 (Cum. Supp. 1998) states:

> In any case when no parent appears in a hearing with the juvenile or when the judge finds it would be in the best interest of the juvenile, the judge may appoint a guardian of the person for the juvenile. The guardian shall operate under the supervision of

the court with or without bond and shall file only such reports as the court shall require. The guardian shall have the care, custody, and control of the juvenile or may arrange a suitable placement for him and may represent the juvenile in legal actions before any court. The guardian shall also have authority to consent to certain actions on the part of the juvenile in place of the parent including marriage, enlisting in the armed forces, and undergoing major surgery. The authority of the guardian shall continue until the guardianship is terminated by order, until the juvenile is emancipated pursuant to Article 56, or until the juvenile reaches the age of majority.

With these points in mind, we are now faced with the particular question in this case; namely, whether Al-Neisa Jones was defendant's guardian. To resolve this question, we turn to the facts of the case.

The evidence at the 23 November 1998 hearing consisted of testimony from several law enforcement officers and Al-Neisa Jones, defendant's aunt. Sergeant Lowe of the Burlington Police Department testified that defendant was interrogated in the presence of his aunt. Prior to taking defendant's statement, Sergeant Lowe told defendant

[y]ou have a right to have a mother, father, sister, brother, aunt, uncle, et cetera, with you while you're being questioned. You have your aunt Al-Neisa here with you, and she is actually your guardian. Do you understand this?

After hearing from Sergeant Lowe, the trial court conducted a *voir dire* examination of Al-Neisa Jones. Ms. Jones explained that her sister, Attillah Jones, had come from New Jersey to North Carolina with her six children in March 1998. They stayed with Al-Neisa Jones for three to four months. Attillah Jones then told her sister that she was returning to New Jersey "to go take care of some business." However, she left two of her sons, defendant and Eric, with Al-Neisa Jones. Al-Neisa Jones testified that she tried to get in touch with her sister so she could come get her sons, but was unable to do so. Ms. Jones then explained that, in addition to welfare payments she was already receiving for her own children, she began receiving welfare payments to support her two nephews. Ms. Jones stated that the Department of Social Services did not require her to sign any papers to receive the additional money because it was already familiar with both her and her sister's situations.

**STATE v. JONES**

[147 N.C. App. 527 (2001)]

Ms. Jones testified that she had to meet with school officials and go to the Board of Education to sign papers to enroll defendant in school. Ms. Jones read from portions of the educational residency affidavit that she signed, as follows:

Q. And you see where it says educational residency affidavit?

A. Yes.

Q. I want you to look at the words I'm getting ready to highlight in blue right here. Read what it says, what I—

A. —"Custodial adult."

Q. Custodial adult. Now, you swore to the truth of this affidavit, didn't you?

A. Yes, I did.

. . . .

Q. Now, read paragraph one that I just highlighted in blue?

A. "I am the custodial adult with whom the following children reside."

Q. And read what I just highlighted there beneath that?

A. "Joseph Osmar Jones."

Q. Age?

A. "13 . . ."

Ms. Jones was also asked specific questions regarding her living situation prior to the murder of Tiffany Long:

Q. Did you ever hear from [your sister] again?

A. No.

. . . .

Q. Did you try to get up with her before Tiffany was killed?

A. That's correct.

Q. More than once?

A. That's correct.

Q. But no success whatsoever?

A. Yeah.

Q. Who was feeding Joseph?

A. I was.

Q. Who was providing shelter?

A. I was.

Q. Who was attending to his educational needs?

A. I was.

Q. Who was clothing him?

A. I was.

. . . .

Q. So isn't it fair to say, Ms. Jones, that Joseph was dependent upon you for his room, board, and education, and clothing?

A. That's correct.

At the end of the hearing, the trial court made the following findings of fact:

6. That on October 21, 1998, the defendant was interviewed by Sergt. Lowe and Staff Sergt. Tim Flack at the Burlington Police Department, Criminal Investigation Division interview room; that the defendant was accompanied by his aunt, Alneesa Jones, who was present during the course of the interview process.

7. That in the presence of his aunt, Alneesa Jones, Sergt. Lowe advised the defendant Joseph Osmar Jones of those rights . . . that the defendant acknowledged his understanding of each of those rights by placing in his own handwriting . . . the word "yes" and his initials "JJ"; that the defendant indicated his willingness to speak to the law enforcement officers by placing a "yes" and his initials after the waiver; that the defendant further acknowledged that "no promises or threats have been made to me and no pressure or coercion of any kind used against me by anyone" by placing yes and his initials thereafter.

8. That . . . Alneesa Jones signed in the area designated for parent, guardian, custodian.

. . . .

13. That Alneesa Jones was responsible for and Joseph Jones was dependent upon her for room, board, education, and clothing.

. . . .

15. That in respect to Alneesa Jones, although she may have had conflicting emotions as they relate to her brother, Harold Jones, and to her nephew, Joseph Jones, there is no evidence before this Court that any such conflict was so overbearing that the will of the defendant was overridden to the extent that it interfered with the defendant's free exercise of those rights . . . .

16. That by declaration and conduct, Alneesa Jones did those things that can be construed as a guardian in its broadest legal sense.

. . . .

18. That the advisement of those rights enumerated in N.C.G.S. § 7A-595(a) were done in the presence of Alneesa Jones whom the Court has now declared to be the defendant's guardian.

The trial court then concluded, as a matter of law:

1. That none of the defendant's rights under North Carolina General Statute 7A-595 were violated.

2. That none of the defendant's rights under Chapter 15A were violated.

3. That none of the defendant's rights under the U.S. Constitution or the North Carolina Constitution were violated.

4. That the defendant was fully advised of his rights under Miranda Vs. Arizona and North Carolina General Statute 7A-595, and thereafter knowingly, intelligently, understandingly and willfully waived those rights.

5. That Alneesa Jones was the defendant's guardian within the spirit and intent of N.C.G.S. § 7A-595 and was present during the advisement of those rights and during a confession by the defendant.

At defendant's trial, much of the same testimony regarding defendant's interrogation was elicited from witnesses, and defendant's statement was admitted over a renewed objection based on the trial court's previous determination at the suppression hearing that

Ms. Jones was defendant's guardian. Additionally, the State called Lieutenant Tim Flack, a twenty-one-year veteran of the Burlington Police Department, who was also involved in the case and interviewed defendant on 21 October 1998. He testified that defendant seemed to want to whisper "Harold" as the name of the perpetrator, but would look at his aunt and then fall silent. Specifically, Lieutenant Flack stated:

> We asked Joseph several times who the black male was. . . . He started breathing heavily, and he was trying to whisper a name and he would get out and would almost sound like "Harold." It would come out like HA. And he would say it, but not quite say— he never would say the full name Harold, but that sounded like that's what he was trying to say. He'd look at his aunt Al-neisa who was sitting to his left. And, uh, before he would say it, and then he'd look back down and he never would, uh—wouldn't give me the full name. The last time he whispered what I thought sounded like Harold, Al-neisa jumped up and said, "I'm sorry, I have to go pee."

Another officer, Sergeant Doug Murphy, testified that Al-Neisa Jones told him defendant had harmed her children in the past and she believed defendant, not her brother, had murdered Tiffany Long. Ms. Jones told officers that she was afraid of defendant and wanted him taken to court, and she accused him of murder. However, Sergeant Lowe said Ms. Jones did not intimidate defendant, twice encouraged him to tell the truth, and acted "like a natural, concerned parent."

Defendant maintains the trial court erroneously concluded that his aunt was his guardian because there is a definition of "guardian," based on legislative intent, that she does not meet. Defendant also utilizes the canon of statutory construction, *ejusdem generis*, to argue that the term "guardian" should be construed to apply only to terms of the same class as those previously enumerated in N.C. Gen. Stat. § 7A-595. Thus, defendant argues, a guardian must be interpreted to mean someone court-appointed, with legally established rights and responsibilities regarding the juvenile. To that end, defendant asserts the Director of the Alamance County Department of Social Services is technically his guardian. *See* N.C. Gen. Stat. § 35A-1220 (1999). Finally, defendant points out that Ms. Jones never stated that she considered herself defendant's guardian; moreover, she was never appointed by a court or clerk of court to be his guardian, nor was she supervised by a court in that capacity.

Defendant also states that he was in no position to deny that Ms. Jones was his guardian, after Sergeant Lowe told him she was his guardian. Defendant did not know his aunt had accused him of murder and was ignorant of her "agenda" to protect her brother. He maintains that the officers did not try to find out if Ms. Jones was his guardian; instead, they just assumed she was, and their assumption amounted to bad faith. Defendant further asserts that the trial court failed to make any findings of fact that the officers reasonably believed Ms. Jones to be defendant's guardian, and, in any event, the statute does not provide for such an exception.

After careful consideration of all the evidence, we conclude that Al-Neisa Jones was defendant's guardian within the spirit and meaning of the Juvenile Code. The definition of "guardian" set forth in Black's Law Dictionary denotes one who "legally has responsibility for the care and management . . . of a child during its minority." Legal authority is not exclusively court-appointed authority, but is rather any authority conferred by the government upon an individual. Applying the facts previously set forth to this definition, it is clear that defendant's aunt was his guardian. Both DSS and the local school system, each a part of the State, gave Ms. Jones lawful authority over defendant. We believe she thus acted as a "guardian" for the purposes set forth in N.C. Gen. Stat. § 7A-595.

## (2) Constitutional Considerations

[2] Defendant also argues his statement was improperly admitted in violation of his Fifth, Sixth and Fourteenth Amendment rights. Statements elicited by governmental misconduct offend constitutional rights. *Miller v. Fenton*, 474 U.S. 104, 88 L. Ed. 2d 405 (1985). In support of his contention, defendant makes the same evidentiary observations as before, and argues that the admission of his statement requires a new trial because the bike, the pubic hair, and the soiled t-shirt are weak circumstantial evidence connecting him to Dorthia Bynum and Harold Jones on the day of the murder, and to the victim in the past, since only his statement puts him at the murder scene. Thus, defendant maintains that inclusion of his statement amounts to prejudicial error that is harmful beyond a reasonable doubt. *See* N.C. Gen. Stat. § 15A-1443(b) (1999); and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705 (1967).

"The findings of a trial court following a *voir dire* hearing on the voluntariness of a confession are conclusive and will not be disturbed on appeal if they are supported by competent evidence in the record."

*State v. Gibson*, 342 N.C. 142, 146-47, 463 S.E.2d 193, 196 (1995). If a defendant fails to except specifically to any findings of fact, they are not reviewable on appeal. *State v. Cheek*, 351 N.C. 48, 63, 520 S.E.2d 545, 554 (1999), *cert. denied*, 530 U.S. 1245, 147 L. Ed. 2d 965 (2000).

"Whether a waiver is knowingly and intelligently made depends on the specific facts of each case, including the defendant's background, experience, and conduct." *State v. Brown*, 112 N.C. App. 390, 396, 436 S.E.2d 163, 167 (1993), *aff'd*, 339 N.C. 606, 453 S.E.2d 165 (1995). In this case, the trial court found defendant knowingly and intelligently waived his rights. The trial court noted that defendant made good grades in school and had the level of intelligence necessary to effect a knowing and intelligent waiver of his rights. Additionally, the trial court found that the warnings defendant received complied with the requirements delineated by *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). Also, as defendant did not argue to the trial court that his Sixth Amendment rights were violated, we cannot consider this argument on appeal. *State v. King*, 342 N.C. 357, 364, 464 S.E.2d 288, 293 (1995).

Because we conclude that Al-Neisa Jones was defendant's guardian within the spirit and meaning of the North Carolina Juvenile Code, we also conclude that defendant was afforded all statutory procedural protections during his interrogation by the police. Defendant's waiver of his rights was made knowingly and intelligently, and his statement was properly included at trial. Defendant's first assignment of error is hereby overruled.

## II. Expert Testimony

[3] Defendant next argues that the trial court erred in admitting the testimony of Dr. Sharon Cooper, who testified as to Tiffany Long's sexual behavior. The main point of Dr. Cooper's testimony is that she did not believe Tiffany would have had consensual sex with defendant the day before her murder, thereby rebutting defendant's explanation of events.

During defendant's trial, the State called Dr. Sharon Cooper to testify. Dr. Cooper was a developmental and forensic pediatrician with extensive experience in pediatrics. She was tendered, without objection, as an expert witness in the field of developmental and forensic pediatrics. When the State's questions regarding defendant's case began, Dr. Cooper testified that she had reviewed the victim's medical records, the police investigation reports, the autopsy report from the State Chief Medical Examiner, Dr. John Butts, and autopsy

photographs. Dr. Cooper also testified that she had taken a personal history from the victim's grandmother "for the purpose of obtaining more medical information." While the prosecutor was looking for the photographs, defendant's attorney addressed the trial court, outside the presence of the jury:

MR. MORSE [Defendant's attorney]: If your Honor please, we would object. It appears that Dr. Cooper never examined Tiffany Long.

THE COURT: It's not required.

MR. MORSE [Defendant's attorney]: If your Honor please, under 403, we would object to whatever she's gonna say. It is, uh—it's gonna be highly inflammatory. It's not relevant to anything in rebuttal.

THE COURT: How do you know it's inflammatory if you haven't heard her testify?

MR. MORSE [Defendant's attorney]: Because, with her credentials, your Honor, you know whatever she says is going to be believable, I promise you. And I'd like to know where they're going with this.

THE COURT: Well, I'll let [the prosecutor] make a proffer in just general parameters. I assume it's in rebuttal to the defendant's testimony, though.

A short time later, Dr. Cooper was asked the following questions:

Q. Did you sit in here today and listen to Joseph Jones's testimony?

A. Yes, I did.

Q. Did you hear his testimony wherein he essentially described Tiffany Long as having seduced him there in the living room of her house while he was getting a glass of water?

MR. MORSE [Defendant's attorney]: We would object, Your Honor, to Mr. Johnson's characterization of the evidence.

THE COURT: Overruled.

A. Yes, I did hear that testimony.

Q. Have you an opinion, satisfactory to yourself, as to whether or not on the 15th of October, 1998, this behavior

would be characteristic of a child fitting Tiffany Long's description from all of the information that you've had made available to you?

A. I do have an opinion.

Q. What is that opinion?

A. My opinion is that the description of Tiffany having seduced, uh, a youth offender is extremely out of character. You do not have a child who has given any indication that she is sexually promiscuous or that she is precocious in any way as far as her sexual being is concerned. . . . This is very out of char- — would be—have been very out of character for a child who has all of the other behaviors and symptoms that we see in this child who carries dolls in her little backpack and who plays with dolls in the evenings and who has sleepovers with children three and four years younger than she is. That would be extremely out of character.

Defendant's first objection essentially claims that Dr. Cooper's expert opinion testimony was unduly prejudicial to him. Defendant's second objection takes issue with the way the prosecutor characterized part of defendant's testimony. On appeal, however, defendant couches his assignment of error in terms of the adequacy of the foundation for Dr. Cooper's testimony. As evidenced by the previous excerpts from the trial transcript, defendant did not raise this specific objection at trial. Moreover, defendant has not clearly identified the evidence which he finds improper and has not assigned plain error to this assignment of error on appeal. As defendant has failed to assign plain error, he has not preserved this issue for our review. *See* N.C. R. App. P. 10(b)(1) (1999); N.C. R. App. P. 10(c)(4) (1999); and *State v. Frye*, 341 N.C. 470, 495-96, 461 S.E.2d 664, 676-77 (1995), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996). Since defendant's two trial objections did not attack the foundation or substance of Dr. Cooper's testimony, they are not adequate grounds upon which defendant may now challenge that foundation.

We further note that the trial court did not abuse its discretion in accepting Dr. Cooper as an expert in developmental and forensic pediatrics. N.C. Gen. Stat. § 8C-1, Rule 702(a) (1999) states:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge,

skill, experience, training, or education, may testify thereto in the form of an opinion.

North Carolina case law has interpreted Rule 702 as follows:

> [F]or [an expert's] testimony to be admissible as expert testimony, the witness must be qualified by "knowledge, skill, experience, training, or education." North Carolina case law requires only that the expert be better qualified than the jury as to the subject at hand, with the testimony being "helpful" to the jury. *State v. Huang*, 99 N.C. App. 658, 663, 394 S.E.2d 279, 282, *disc. review denied*, 327 N.C. 639, 399 S.E.2d 127 (1990). Whether the witness qualifies as an expert is exclusively within the trial judge's discretion, *id.*, (citation omitted), "and is not to be reversed on appeal absent a complete lack of evidence to support his ruling." *State v. Howard*, 78 N.C. App. 262, 270, 337 S.E.2d 598, 603 (1985), *disc. rev. denied*, 316 N.C. 198, 341 S.E.2d 581 (1986).

*State v. Davis*, 106 N.C. App. 596, 601, 418 S.E.2d 263, 267 (1992), *disc. review denied*, 333 N.C. 347, 426 S.E.2d 710 (1993).

Additionally, N.C. Gen. Stat. § 8C-1, Rule 705 (1999) states:

> The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless an adverse party requests otherwise, in which event the expert will be required to disclose such underlying facts or data on direct examination or voir dire before stating the opinion. The expert may in any event be required to disclose the underlying facts or data on cross-examination. There shall be no requirement that expert testimony be in response to a hypothetical question.

Dr. Cooper testified after examining Tiffany's medical records, autopsy photographs, and the autopsy report from Dr. Butts, and after reviewing a family history taken from Tiffany's grandmother. Her testimony rebutted defendant's assertion that he had consensual sex with the victim the day before her murder. After careful review of the record and consideration of the arguments, we overrule defendant's second assignment of error.

### III. Motion to Dismiss

[4] Defendant next argues that the trial court erred in denying his motion to dismiss. In support of this assignment of error, defendant relies on his previous arguments regarding the admission of his state-

ment and the testimony of Dr. Cooper, and maintains that his motion to dismiss should have been granted based on the State's failure to prove the essential elements of the crimes against him.

The standard of review on a motion to dismiss is as follows:

> [A]ll of the evidence, whether competent or incompetent, must be considered in the light most favorable to the state, and the state is entitled to every reasonable inference therefrom. Contradictions and discrepancies are for the jury to resolve and do not warrant dismissal. In considering a motion to dismiss, it is the duty of the court to ascertain whether there is substantial evidence of each essential element of the offense charged. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980) (citations omitted). Moreover,

> [o]nce the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then " 'it is for the jury to decide whether the facts, *taken singly or in combination*, satisfy [it] beyond a reasonable doubt that the defendant is actually guilty.' "

*State v. Barnes*, 334 N.C. 67, 75-76, 430 S.E.2d 914, 919 (1993) (citations omitted). In making this determination,

> the defendant's evidence should be disregarded unless it is favorable to the State or does not conflict with the State's evidence. . . . When ruling on a motion to dismiss, the trial court should be concerned only about whether the evidence is sufficient for jury consideration, not about the weight of the evidence.

*State v. Fritsch*, 351 N.C. 373, 379, 526 S.E.2d 451, 455-56, *cert. denied*, 531 U.S. 890, 148 L. Ed. 2d 150 (2000) (citations omitted).

Based on the evidence previously discussed in connection with defendant's other assignments of error, we conclude that the State presented sufficient evidence to survive defendant's motion to dismiss. Defendant's third assignment of error is hereby overruled.

### IV. Transfer to Superior Court

**[5]** By his final assignment of error, defendant contends the trial court erred in transferring his case from juvenile court to superior court. Defendant maintains the transfer occurred because the trial

court improperly based its determination of probable cause on his statement. Because he believes his statement should have been suppressed, defendant contends his transfer to superior court was based on improperly admitted evidence. As previously discussed, defendant's motion to suppress his statement was properly denied. Thus, we disagree with defendant's arguments regarding the transfer of his case.

In all felony cases where the accused is thirteen years of age or older, the State's burden is simply to "show that there is probable cause to believe that the offense charged has been committed and that there is probable cause to believe that the juvenile committed it[.]" N.C. Gen. Stat. § 7A-609(c) (1995). N.C. Gen. Stat. § 7A-609(a) states: "(a) The court shall conduct a hearing to determine probable cause in all felony cases in which a juvenile was 13 years of age or older when the offense was allegedly committed."

In cases where the offense is a Class A felony, transfer of the case to superior court is *mandated* by N.C. Gen. Stat. § 7A-608. N.C. Gen. Stat. § 7A-608 states:

> The court after notice, hearing, and a finding of probable cause may transfer jurisdiction over a juvenile to superior court if the juvenile was 13 years of age or older at the time the juvenile allegedly committed an offense that would be a felony if committed by an adult. If the alleged felony constitutes a Class A felony and the court finds probable cause, the court shall transfer the case to the superior court for trial as in the case of adults.

There was extensive evidence provided by the officers regarding the location and condition of the victim's body, the bloody bike track through the yard, defendant's whereabouts and activities the day of the murder, the bike at defendant's residence, and the condition of the clothing found in defendant's bedroom. All this evidence was admissible pursuant to N.C. Gen. Stat. § 7A-609, and it was properly considered by the trial court. The trial court did not err in concluding that probable cause existed to show that defendant committed a Class A felony (first degree murder). The superior court automatically acquired jurisdiction over the first degree kidnapping and first degree sexual offense charges because they arose out of the same act or transaction as the murder.

We also note that this Court has previously held there can be no appellate review of a mandatory transfer done pursuant to N.C. Gen.

Stat. § 7A-608. "There [is] thus no discretion as to that transfer for the juvenile court to exercise and for this Court to review." *In re Ford*, 49 N.C. App. 680, 682, 272 S.E.2d 157, 159 (1980). Defendant's final assignment of error is therefore overruled.

After careful consideration of the record, we conclude defendant received a fair trial, free from prejudicial error.

No error.

Judge MARTIN concurs.

Judge BIGGS concurs in result with separate opinion.

BIGGS, Judge concurring in the result with separate opinion.

While I believe the defendant received a fair trial free of prejudicial error; the admission of his confession was in violation of N.C.G.S. § 7A-595(b) (now N.C.G.S. § 7B-2101(b)), and therefore error, albeit harmless.

N.C.G.S. § 7A-595(b) provides in pertinent part:

> When the juvenile is less than 14 years of age, no in-custody admission or confession resulting from interrogation may be admitted into evidence unless the confession or admission was made in the presence of the juvenile's parent, guardian, custodian or attorney.

The trial court concluded "that Al-Neisa Jones was the defendant's guardian within the spirit and intent of N.C.G.S. § 7A-595 and was present . . . during a confession by the defendant." The majority adopted similar language in its conclusion that "Al-Neisa Jones was defendant's guardian within the spirit and meaning of the Juvenile Code." The rules of statutory construction however are clear that there is no room for judicial construction where the language of a statute is clear and unambiguous. *State v. Green*, 348 N.C. 588, 596, 502 S.E.2d 819, 823-24 (1998), *cert. denied*, 525 U.S. 1111, 142 L. Ed. 2d 783 (1999). *See also In re Declaratory Ruling by N.C. Comm'r of Ins.*, 134 N.C. App. 22, 517 S.E.2d 134, *disc. review denied*, 351 N.C. 105, 540 S.E.2d 356 (1999) (court held that is the function of the judiciary to construe a statute only when the meaning

is in doubt). Where the language of a statute is clear and unambiguous, the court is without power to interpolate, or superimpose, provisions and limitations not contained herein. *State v. Green*, 348 N.C. at 596, 502 S.E.2d at 824.

In the case *sub judice*, while the term guardian does not appear in the section marked "Definitions", another provision in the Juvenile Code sets forth the appointment, authority and responsibilities of a guardian. *See* N.C.G.S. § 7A-585 (now N.C.G.S. Chapter 7B (1999)). In this provision, the term guardian requires court appointment and supervision. Moreover, a second rule of judicial construction is that all statutes dealing with the same subject matter are to be construed in *pari-materia* i.e., in such a way to give effect, if possible, to all provisions. Further, where one statute deals with certain subject matter in particular terms and another deals with the same subject matter, in more general terms, the particular statute will be viewed as controlling in the particular circumstances absent clear legislative intent to the contrary. *State ex rel. Utilities Comm. v. Thornburg*, 84 N.C. App. 482, 485, 353 S.E.2d 413, 415, *disc. review denied*, 320 N.C. 517, 358 S.E.2d 533 (1987). Had the legislature intended for (guardian) to have one meaning in N.C.G.S. § 7A-595(b) and another in other provisions in the Juvenile Code, it could have said so. It was not permissible for the trial court and the majority of this Court to go outside of the Juvenile Code to define a term where such term is clearly defined within the Code.

Accordingly, I conclude it was error for the trial court to conclude that Al-Neisa Jones was a guardian under N.C.G.S. § 7A-595(b). Thus the confession should have been suppressed. However, error alone will not justify a reversal. Only where there is a reasonable possibility that, without the error complained of, a different result might have been reached, the error is prejudicial and the defendant is entitled to a new trial. *State v. Moctezuma*, 141 N.C. App. 90, 539 S.E.2d 52 (2000) (Court awards new trial, stating that error is prejudicial if it is reasonable possible that erroneously admitted evidence determined outcome); *State v. Robinson*, 136 N.C. App. 520, 524 S.E.2d 805 (2000) (holding that error warrants new trial only if defendant can show he was prejudiced thereby; prejudice occurs when there is a reasonable possibility that without the error, the result of the trial would have been different).

In the present case, there is substantial evidence of guilt without the confession. The evidence against defendant included witnesses who saw him on a bicycle leading Tiffany Long to the house where

she was killed. An eye witness saw the defendant on a blue, Huffy Mountain bike on the afternoon of the murder and identified the "Stone Cold Steve Austin T-shirt" and the light blue Tommy Hilfiger jeans, both of which, Dr. Butts concluded had fecal matter on them, as the clothing defendant was wearing on the afternoon of the murder. The jeans also had blood on them and that blood matched the DNA profile of Tiffany Long. Defendant conceded that the blue, Huffy, mountain bike outside Ms. Jones's apartment belonged to him. The bicycle had a chemical indication of blood on one pedal and the tread of its tires was consistent with the tread marks crossing the bloody trail in the back yard of 614 Lakeside. A pubic hair containing defendant's DNA was found in the perineal fold of the victim—a ten-year-old girl who had not reached puberty, who had no pubic hair, and who took a bath every night almost as ritual.

Defendant cannot demonstrate prejudice where the evidence of guilt is so compelling. Accordingly, I concur with the majority that defendant is not entitled to a new trial.