STATE OF NORTH CAROLINA
v.
MARSHALL DARRELL OVERBY
No. COA06-384
Court of Appeals of North Carolina.
Filed May 1, 2007
This case not for publication
Attorney General Roy A. Cooper, III, by Assistant Attorney General Linda Kimbell, for the State.
John T. Hall, for defendant.
JACKSON, Judge.
At approximately 2:00 in the afternoon on 17 February 2005, Sergeant Jeff McCormick ("Sergeant McCormick") of the Wadesboro Police Department responded to a report expressing concern about a child inside a van parked at the Feed My Lambs ministry. Sergeant McCormick, along with two other officers from the Wadesboro Police Department, found Marshall Overby ("defendant") in the van with a two-year-old, male child, later identified as R.P. Officers noticed that R.P. was sitting in a car seat resting on the floor between the two front seats, and that the car seat was not strapped down.
At trial, Sergeant McCormick explained,
When I first noticed the child, I could tell he had a knot on his forehead, which has [sic] bruising around it. Also both of his eyes up under them was [sic] black and blue. I noticed, I think it might have been his right ear, it looked like it had on the top where it looked like to me maybe cigarette burns. The child's left ear was [sic] bruising around the outside and on the inside of it.
Sergeant McCormick addressed defendant and inquired about the cause of the child's condition. Defendant explained that in the process of moving a child's play table, the table had fallen on R.P. Sergeant McCormick became suspicious and suggested that a table falling on the child could not have caused the type and number of injuries on the child. Consequently, Sergeant McCormick contacted emergency medical services ("EMS"), and also radioed the police dispatcher and requested that the Department of Social Services ("DSS") be contacted.
Teresa Morton ("Morton") with Anson County EMS arrived at the scene to investigate the child's injuries. Defendant became upset and stated that "he didn't see that the child needed to be checked." Defendant was holding R.P. and refusing to turn him over to the police officers. Morton explained that defendant "was screaming to the top of his lungs that they were accusing him of beating his child." Defendant reluctantly turned the child over when officers informed him that they would take him into custody if he did not relinquish control of the child.
During her examination, Morton noted that
[t]he baby was very bruised, both eyes were black and blue. There was bruising all up both sides of his cheeks, his neck area. The left ear was completely purple and reddish tint inside and out, the whole back of it, with some dried blood inside of it. There was a large knot on the front of his forehead.
Morton also testified that R.P. "had several deformities throughout the top of his head that you could fee[l]." These "little knots" and "lacerations" could be seen and felt "throughout his entire head area, the top and back." Morton also discovered cigarette burn marks around the top of R.P.'s right ear, and Morton testified that the burn marks "were fresh looking, because they had dried blood around them."
After conducting the initial examination, Morton, along with her partner, Billy Gibson, and her supervisor, Scott Russell, brought R.P. into the back of the ambulance and helped R.P. change out of his clothes, which Morton described as "dirty" and "soaking wet." Morton testified that "[t]he front of the shirt that he had on looked like dried vomit, and I can say that because I have the medical training to describe that." The Feed My Lambs ministry provided clean clothes and clean diapers, which defendant initially refused. Morton explained that defendant "started cussing at the ladies in the ministry store concerning the clothes" and stating "that he wasn't going to take no . . . damned charity from anybody." Defendant eventually conceded, and while helping R.P. out of the soiled clothes, Morton found additional bruising on R.P.'s body  specifically, "on the chest area, the arms, the neck, the entire back area." Morton also discovered extensive bruising when she and her partner removed R.P.'s diaper.
When I went to remove the diaper, also which was soaked, I mean it was just completely soaked through, that's when he threw his little hands down to his straddle and started saying daddy hurts. And when I pulled the diaper back, that's when I seen all the red marks and the bruisings that was through his straddle and on his private area. Bruising all down his legs, most of them were the purplish tint to them. There was some that was older looking, which is the yellowish type. The back of his back down across his buttocks was like  I thought at first it was like marks from a hairbrush. It looked just like something that had hit him and left little, like little spike marks. And it was  it was all the way down across his buttocks, down the back of his legs, inside of his legs. We pulled his shoes off. He had blood on his socks, and there was marks on the bottom of his feet, the top of his feet, and there was some dried blood there also.
When Morton removed R.P.'s clothes, R.P. made comments such as "[R.P.] bad," "daddy hurts," and "clothes dirty." Based upon her findings, including the fact that many of the injuries appeared to have been "fresh looking," Morton determined that R.P. needed to be seen by other medical professionals at the hospital.
Joan Polk ("Polk") of DSS also arrived at the scene and entered the ambulance to meet with R.P. and the EMS workers. Polk saw that R.P. had two black eyes and "a V on his forehead that was bruised." She asked R.P. what his name was and attempted to make R.P. feel comfortable with her. Polk then conducted an examination and testified,
I felt knots all over his head that were swollen. And when I pulled his . . . bangs back on his forehead, . . . I saw the V more clearly, and it was bruised and it was swollen. I looked at his ears and he had burns on the outside of his earlobe on both ears, and his ears were just red and purple. It was blood. And there appeared to be marks, . . . bite marks by his right eye, and he had two black eyes, and there appeared to be a burn mark by his nostril. And there were more burn marks by his mouth . . . and he had bruises on his neck that were in various stages, anywhere from yellowish to green to purple. . . . His arms had bruises and scratches. His hands, his fingers, his chest. I turned him around, and the whole time I was doing this I kept talking to him, just trying to make him feel comfortable, and his back had bruises and marks, his chest, his belly, his legs. The only part of him that I did not see a mark on was his penis. Even his scrotum had . . . a red mark, appeared to be some type of bruise, hematoma.
Polk also noted that R.P.'s body was covered with fresh "oval-shaped" marks with dots. R.P. told her that "Daddy hurt," but Polk did not ask R.P. any questions at that time. Polk asked EMS to transport R.P. to the DSS office, and she asked the police to escort defendant to the DSS office. As the ambulance was driving away, R.P. stated, "Daddy gone" and "Daddy hurt."
At the DSS office, Polk gave R.P. some crackers, and based on the way he quickly devoured the crackers, she determined he was hungry and purchased some food for him. She stated that "he just took the food, he just grabbed it and shoved it in his mouth." Subsequently, Polk took the food away from R.P. and "g[a]ve it to him [in] smaller pieces so that he could eat that." Meanwhile, Polk examined the clothes that had been removed from R.P. She discovered vomit and blood on the clothes, and she noted that the clothes were wet and that "[h]is socks were dirty, his tennis shoes were dirty, his clothes were dirty, and he stunk."
At the DSS office, Mary Kendall ("Kendall") interviewed defendant. During the interview, defendant was uncooperative and mercurial, and he reeked of marijuana. Defendant denied knowledge of any of R.P.'s injuries except for the forehead injury, which defendant stated was caused when a table fell on R.P. Kendall noted that defendant "became frustrated in describing the table, cursed [Kendall], stated that he could do to his child whatever he wanted to and that [DSS] couldn't tell him how to discipline his child." Defendant's story regarding the table varied during the interview; defendant told Kendall at one point that the table had fallen on the child the night before, but he also stated that the incident happened "days ago" and even "weeks ago." Defendant also stated that R.P. had fallen off the porch, and at various points during the interview, defendant laughed and giggled. Throughout the interview, defendant repeatedly denied injuring R.P.
R.P. was taken to the emergency department at Anson County Hospital, and Carolyn Tucker ("Tucker"), a nurse at the hospital, attended to R.P. Tucker testified as to R.P.'s injuries, and she marked the injuries on thirteen photographs. She described the "distinctive" and "consistent pattern" of bruising on R.P.'s body, especially his buttocks and legs. In total, the nursing record noted thirty-five body parts where pain or injury could be found.
On 18 February 2005, R.P. was placed in foster care in the home of Audrey and Darin Allen. The first night R.P. was in the Allens' home, R.P. would not sleep by himself, so the Allens allowed him to sleep in their bed. However, R.P. frequently awoke from nightmares, screaming, crying, and pleading not to be hurt. The Allens noted that R.P. slept on his stomach with his hands covering his back side, and he also kept his hands behind his back when he played. The Allens also described how R.P. would "tense up" in situations when he thought he may get hurt. For example, Audrey Allen testified,
[W]e had a birthday party for another child in the house, and adults were standing around the table, we put a candle in the birthday cake, and we went to light the candle, and his little hands went up like this, and he started screaming hot, hot, I mean he was jerking, jerking, jerking and screaming. And he got down off the chair and he crawled up under the table. And he was just screaming, just screaming, you know, hot, hot.
Christine Mills ("Mills") of DSS interviewed both R.P.'s mother, Lauren P. ("Lauren"), and defendant. When Mills informed them that she would first speak with Lauren alone, defendant became agitated and stated that he did not understand why Mills needed to speak with Lauren alone. When Mills' interview with Lauren concluded, Mills watched as Lauren went to the car to ask defendant to come inside. Mills, however, became concerned for Lauren's safety when she "could tell by [defendant's] body language and his facial expression that he was angry. He appeared to be yelling. He was leaning in towards [Lauren] and his face looked angry, his eyebrows were knit . . . ." Defendant yelled at Mills and demanded "to know what the heck we had been talking about for so long, what possibly we could have been talking about for three hours."
During Mills' interview with defendant, defendant admitted that he had paddled R.P. with "a plastic shallow ladle with holes to strain food." Defendant clarified that he had hit R.P. with the ladle three times. Defendant explained that he paddled R.P. when R.P. would attempt to play with electrical outlets after being warned not to do so by defendant. Defendant further explained how the play table had fallen on R.P. when he was attempting to install legs on the table. Defendant was not certain on what date this had occurred, but he estimated that the incident had happened on 10 or 11 February 2005. Despite the fact that R.P.'s injuries still appeared serious a week later when the police, EMS, and DSS encountered the child on 17 February 2005, defendant explained that he did not take R.P. to the hospital because "he knew that if he taken [R.P.] to the hospital to the emergency department for his forehead that he would have had to just sit there for a few hours and wait to be told that it was nothing and to go home."
On 6 June 2005, defendant was indicted for felony child abuse inflicting serious injury, and on 7 December 2005, the jury found defendant guilty of the indicted offense. The trial court sentenced defendant as a prior record level III offender to a minimum of thirty-four months imprisonment with a corresponding maximum of fifty months, and defendant gave notice of appeal in open court.
As a preliminary matter, we note that defense counsel failed to sign his name at the conclusion of defendant's brief. Rule 28(b) of the North Carolina Rules of Appellate Procedure expressly requires that an appellant's brief contain "[i]dentification of counsel by signature." N.C. R. App. P. 28(b)(8) (2006). Nevertheless, to prevent manifest injustice, we choose not to strike defendant's brief. See N.C. R. App. P. 2 (2006).
On appeal, defendant first contends that the trial court erred in denying his motion to dismiss the charge at the close of the evidence. Defendant, however, has waived his right to appellate review of this issue.
Pursuant to North Carolina General Statutes, section 15A-1227,
(a) A motion for dismissal for insufficiency of the evidence to sustain a conviction may be made at the following times:
(1) Upon close of the State's evidence.
(2) Upon close of all the evidence.
(3) After return of a verdict of guilty and before entry of judgment.
(4) After discharge of the jury without a verdict and before the end of the session.
(b) Failure to make the motion at the close of the State's evidence or after all the evidence is not a bar to making the motion at a later time as provided in subsection (a).
(c) The judge must rule on a motion to dismiss for insufficiency of the evidence before the trial may proceed.
N.C. Gen. Stat. § 15A-1227 (2005). As this Court has held, a "[d]efendant's failure to comply with Rule 10(b) by failing to renew his Motion to Dismiss at the close of all evidence mandates a dismissal of this appeal." State v. Buchanan, 170 N.C. App. 692, 693, 613 S.E.2d 356, 356 (2005); see also State v. Hinnant, 131 N.C. App. 591, 596.97, 508 S.E.2d 537, 540 (1998), aff'd in part, rev'd in part on other grounds, 351 N.C. 277, 523 S.E.2d 663 (2000). Additionally, as expressly provided by statute, the trial court must rule on a motion to dismiss, see N.C. Gen. Stat. § 15A-1227(c) (2005), and Rule 10(b)(1) of the North Carolina Rules of Appellate Procedure provides that "[i]n order to preserve a question for appellate review, a party must . . . obtain a ruling upon the party's request, objection or motion." N.C. R. App. P. 10(b)(1) (2006).
Here, defendant's motion to dismiss at the close of State's evidence was denied. Although defendant contends in his brief that the trial court erred in denying his motion to dismiss made at the close of all the evidence, defendant, in fact, failed to renew his motion to dismiss at the close of all the evidence. During the charge conference, defense counsel requested a certain jury instruction based on issues raised during the hearing on defendant's earlier motion to dismiss. Referring to the motion to dismiss, defense counsel stated:
I mean as Your Honor has said in the motion, don't forget to remind me to renew that for the record here, but anyway, Your Honor said in the motion we've got two things here, but if the State's going to talk about the head injuries, the injuries from the falling table, then that Instruction definitely should be given here.
(Emphasis added). Defense counsel, however, did not renew that motion to dismiss, and it was not the responsibility of the trial court to remind defense counsel to do so. After the trial court sentenced defendant, defense counsel moved to dismiss stating, "It occurred to me that at the conclusion of the Defendant's evidence yesterday I failed to renew my Motion to Dismiss. I would like to enter that Motion without any further argument at this time for the purposes of the appellate record." The trial court permitted defense counsel's request stating, "The Court will allow him to reopen the case in chief for the purpose of [defense counsel] lodging, renewing his Motion to Dismiss the Case at the Conclusion of the All the Evidence." The court, however, did not rule on the motion to dismiss. Defendant's failure to renew the motion to dismiss until after defendant was sentenced, combined with the trial court's failure to rule on the motion, waives defendant's right to appellate review of this issue. See Buchanan, 170 N.C. App. at 693, 613 S.E.2d at 356; Hinnant, 131 N.C. App. at 596.97, 508 S.E.2d at 540; N.C. R. App. P. 10(b)(1) (2006).
Defendant next contends that the trial court erred by accepting the verdict and entering judgment when there was a fatal variance between the indictment and the evidence. We disagree.
"In North Carolina, it is the settled rule that the evidence in a criminal case must correspond with the allegations of the indictment which are essential and material to charge the offense." State v. Simmons, 57 N.C. App. 548, 551, 291 S.E.2d 815, 817 (1982) (internal quotation marks, alteration, and citation omitted). In the instant case, the indictment provided that on 17 February 2005, defendant
[u]nlawfully, willfully and feloniously did intentionally commit an assault that resulted in serious physical injury[ ] severe bruising to the head, face, torso, arms, buttocks, scrotum, and legs; burns to the ears, lip, and face; and large hematoma to the forehead [] on [R.P.], who was two years old and thus under 16 years of age. At the time the defendant inflicted the injury the defendant was providing care for the child as a person who lives with the child's mother as a boyfriend.
Defendant contends that the State's evidence merely showed "that the injuries sustained by the child had been inflicted by the accidental falling of a table that struck R.P.'s head and by the disciplining of the child on the buttocks only." Defendant, therefore, argues that the evidence contradicts the allegations in the indictment. The State, however, is correct that "[t]his is a woefully inadequate recitation of the evidence." The evidence presented before the trial court showed that R.P.'s body was covered in marks and bruises. His back, chest, arms, hands, stomach, buttocks, legs, and feet bore marks of different colors, which in turn indicated that the age of the injuries varied. Both of his eyes were black; there were bite marks near his right eye; and there was dried blood inside his left ear. There also were fresh cigarette burns on his right ear and around his mouth. In total, the nursing record, including thirteen photographs, noted thirty-five injured body parts. Although defendant stated that a table fell on R.P. and admitted to hitting R.P. three times with a ladle, such an explanation cannot account for the systemic injuries of varying degrees and ages on R.P.'s body. Defendant's argument, therefore, is without merit.
Defendant also contends that the State failed to offer evidence at trial of the specific date of injury  i.e., 17 February 2005  alleged in the indictment. As this Court has held, however, "a variance which is not essential is not fatal to the charged offense." State v. Qualls, 130 N.C. App. 1, 8, 502 S.E.2d 31, 36 (1998), aff'd, 350 N.C. 56, 510 S.E.2d 376 (1999) (per curiam). "All that is required to indict a defendant for felonious child abuse is an allegation that the defendant was the parent or guardian of the victim, a child under the age of 16, and that the defendant intentionally inflicted any serious injury upon the child." Id. (citing N.C. Gen. Stat. § 14-318.4(a) (1993)). "[I]f an indictment contains an averment unnecessary to charge the offense, such averment may be disregarded as inconsequential surplusage." State v. Grady, 136 N.C. App. 394, 396, 524 S.E.2d 75, 77, disc. rev. denied and appeal dismissed, 352 N.C. 152, 544 S.E.2d 232 (2000). The date of injury is not essential to a charge of felonious child abuse. See State v. Burton, 114 N.C. App. 610, 612, 442 S.E.2d 384, 386 (1994) (holding that "`the date given in the bill of indictment is not an essential element of the crime charged and the fact that the crime was in fact committed on some other date is not fatal.'" (quoting State v. Norris, 101 N.C. App. 144, 151, 398 S.E.2d 652, 656 (1990), disc. rev. denied, 328 N.C. 335, 402 S.E.2d 843 (1991))). Moreover, defendant has not argued persuasively that any alleged uncertainty about the date of the offense affected his ability to present an adequate defense. See id. at 614, 442 S.E.2d at 386. Accordingly, this assignment of error is overruled.
In his final argument, defendant argues that the trial court committed error by failing to properly instruct the jury in a way that would preserve the defendant's right to a unanimous verdict.
In Assignment of Error number 3 in the record on appeal, defendant assigned error to "[t]he trial court's instructions to the jury, on the grounds that they were fatally ambiguous and thereby violated the defendant's right to an unanimous jury verdict under the North Carolina Constitution, Art. 1, Sec. 24 and N.C. Gen. Stat. Sec. 15A-1237(b)(2003)." Our Supreme Court has clarified, however, that "constitutional error will not be considered for the first time on appeal." State v. Chapman, 359 N.C. 328, 366, 611 S.E.2d 794, 822 (2005). Defendant did not object at trial on constitutional grounds to the jury instructions, and thus, defendant has failed to preserve this alleged error for appellate review. See id.
In his brief before this Court, defendant attempts to revive Assignment of Error number 3 by contending that "[t]he trial court committed plain error to the unfair prejudice of Marshall Darrell Overby by failing to properly instruct the jury in a way that would preserve the defendant's right to an unanimous verdict." Defendant failed to assign plain error in the record on appeal, however, and this Court's review "is confined to a consideration of those assignments of error set out in the record on appeal." N.C. R. App. P. 10(a) (2006). Accordingly, defendant's argument is not properly before this Court. See State v. McNeil, 350 N.C. 657, 681, 518 S.E.2d 486, 501 (1999); see also State v. Williams, 153 N.C. App. 192, 196, 568 S.E.2d 890, 893 (2002); State v. Jones, 147 N.C. App. 527, 543, 556 S.E.2d 644, 654 (2001); N.C. R. App. P. 10(c)(4) (2006) (noting that a question not preserved by objection at trial may be made the basis of an assignment of error, provided that in the assignment of error, "the judicial action questioned is specifically and distinctly contended to amount to plain error."). Accordingly, defendant's assignment of error is dismissed. For the reasons discussed herein, we hold defendant's conviction for felonious child abuse was free from error.
No Error.
Judges WYNN and STEELMAN concur.
Report per Rule 30(e).