STROUD, Judge.
 

 After the denial of his motions to suppress, defendant pled guilty to first degree murder; he appealed and also filed a motion for appropriate relief with this Court. In 2014, this Court allowed defendant's motion for appropriate relief, reversed the denial of his motions to suppress, and vacated his judgment. The State petitioned the Supreme Court for discretionary review, and ultimately that Court vacated this Court's opinion and ordered that defendant's motion for appropriate relief be remanded for consideration by the trial court. On remand, the trial court denied defendant's motion for appropriate relief. Defendant now appeals the denial of his motion for appropriate relief. On defendant's appeal before us, because defendant was a juvenile at the time of his confession and his uncle was his custodian as defined by North Carolina General Statute § 7B-2101(b) at all relevant times, his attorney did not provide ineffective assistance of counsel in failing to argue his rights under § 7B-2101(b), and his MAR was properly denied.
 

 Furthermore, during the remand, the Supreme Court specifically tolled the time for appeal of the motion to suppress with instructions for this Court to hear such appeal or terminate it, based upon the determination of defendant's MAR. Because defendant did not prevail with his MAR, we have also addressed his arguments regarding denial of his motions to suppress. Defendant argues he did not make a knowing and intelligent waiver of his rights during police interrogation. Because the trial court failed to address key considerations in determining whether defendant made a knowing and intelligent waiver, we remand the order denying defendant's motion to suppress.
 

 I. Procedural Background
 

 Because this appeal addresses the interrogation of defendant and his attorney's effectiveness as counsel, we will not repeat the factual details of defendant's first degree murder charge and conviction but will instead focus on the procedural background of this case which led to this appeal. In 2007, defendant, age 13, provided a signed statement to the Lee County Sheriff's Office stating he had "shot the lady as she was sleeping on the couch in the head." In 2009, defendant was indicted for first degree murder and was prosecuted as an adult.
 

 Although other evidence tended to show that defendant had shot the victim, his signed statement was the most direct evidence of premeditation as an element of first degree murder. Prior to his trial, defendant made separate motions to suppress his statements based upon alleged violations of his right to counsel and his right to remain silent and upon his claim he had not knowingly and
 
 *784
 
 voluntarily waived his Miranda rights. In December of 2012, the trial court denied defendant's motions to suppress, and the trial court found that defendant's uncle was present during the questioning; the uncle was defendant's custodian; an interpreter was provided; and neither defendant nor his uncle "indicated any lack of understanding of what was being said" when defendant agreed to waive his rights. In 2013, defendant pled guilty to first degree murder but preserved his right to challenge the denial of his motions to suppress.
 

 In 2014, defendant filed a motion for appropriate relief ("MAR") with this Court arguing he had been provided ineffective assistance of trial counsel because his attorney did not challenge the admission of his confession because his uncle was not his "parent, guardian, custodian, or attorney[,]" and therefore his rights under North Carolina General Statute § 7B-2101(b) were violated as no appropriate adult had been present during his custodial interrogation. In an unpublished opinion, this Court allowed defendant's MAR, reversed the denial of defendant's motions to suppress, and vacated defendant's judgment.
 

 The State petitioned for discretionary review, and our Supreme Court vacated the Court of Appeal's opinion and remanded the case to this Court for remand to the trial court to conduct an evidentiary hearing on the MAR; the entire Supreme Court order reads:
 

 This case has come before the Court by way of the State's Petition for Discretionary Review pursuant to N.C.G.S. § 7A-31.
 

 Pursuant to N.C.G.S. § 15A-1418, the decision of the Court of Appeals is vacated and this Court now ORDERS this case remanded to the Court of Appeals for remand to the Superior Court, Lee County, for an evidentiary hearing to make findings of fact necessary to determine whether the trial counsel's actions fell below an objective standard of reasonableness,
 
 see
 

 State v. McHone
 
 ,
 
 348 N.C. 254
 
 ,
 
 499 S.E.2d 761
 
 (1998) (remanding a motion for appropriate relief to the trial court with instructions to conduct an evidentiary hearing), and, if so, whether defendant was prejudiced by any deficient performance by his trial counsel.
 

 The time periods for perfecting or proceeding with the appeal are tolled. The Superior Court, Lee County, is ordered to transmit its order on the motion for appropriate relief within 120 days so that the Court of Appeals may proceed with the appeal or enter an order terminating the appeal, as appropriate.
 

 By order of the Court in Conference, this 24th day of September, 2015.
 

 State v. Benitez
 
 ,
 
 368 N.C. 350
 
 ,
 
 777 S.E.2d 60
 
 (2015).
 

 The trial court then held an evidentiary hearing on the MAR and entered an order with these findings of fact:
 

 1. Attorney Fred D. Webb of Sanford, North Carolina, was duly appointed to represent the defendant upon the defendant being charged with murder in Juvenile Court in the District Court of Lee County and continued to represent the defendant through the Superior Court proceedings in Lee County wherein the defendant entered a plea agreement as is of record.
 

 ....
 

 4. Defendant's Uncle, Jeremias-Cruz, advised Mr. Webb that the defendant was Mr. Cruz's sister's son, and that by agreement with defendant's mother, the defendant had lived with him ever since the defendant came to North Carolina from El Salvador; for approximately 1 ½ years before the defendant was arrested. Defendant had no parent, custodian or guardian other than Jeremias Cruz living in the United States.
 

 5. Mr. Cruz provided the sole support for the defendant, had provided the defendant with his own room in Mr. Cruz's house, provided food for the defendant, provided clothing for the defendant, provided medical care for the defendant, enrolled the defendant in the Lee County school system and had otherwise provided all the needs of a juvenile the defendant's age.
 

 6. Attorney Webb had learned from the conferences with Mr. Cruz and with the
 
 *785
 
 defendant that Mr. Cruz had provided all the above referenced care for the defendant and had been accepted as a guardian by the Lee County School system to enroll the defendant in school.
 

 7. Attorney Webb had obtained documentation from the Lee County Schools and Lee County Health Department showing that Mr. Cruz had appeared before each of these entities and been accepted as the guardian of the defendant Juan C. Benitez.
 

 8. Mr. Cruz considered himself to have legal custody of the defendant since he had sole physical custody of the defendant by agreement with his sister and Mr. Cruz had advised others including Detective Brandon Wall on the day the defendant was arrested before the interview of defendant, that he was the defendant's uncle, that the defendant lived with him ..., that he was defendant's legal guardian or custodian and Juan had lived with him for about a year and a half and Mr. Webb had seen this in discovery provided by the State.
 

 9. The defendant's uncle Jeremias Cruz signed or was listed as a parent or guardian on numerous documents some of which are dated January 2006; those documents were obtained and received by Attorney Webb.
 

 ....
 

 12. After learning of the evidence of the relationship of Jeremias Cruz and the defendant, Attorney Webb had a member of his staff, early in his representation of the defendant, research the issue of who is a parent, guardian or custodian under NCGS 7B-2101, and Attorney Webb reviewed the cases of
 
 State v. Jones
 
 and
 
 State v. Oglesby
 
 as written by the Court of Appeals.
 

 ....
 

 15. Prior to the evidentiary hearing on defendant's Motion to Suppress Defendant's statement, attorney Webb read the Supreme Court of North Carolina's opinion in
 
 State v. Oglesby.
 

 ....
 

 18. Attorney Webb, in the exercise of professional judgment, formed the opinion that
 
 Oglesby
 
 as decided by the Supreme Court was not inconsistent with the Court of Appeals opinion in
 
 Jones
 
 in that the same factors were discussed in determining if a person qualified as an approved person under NCGS 7B-2101, those factors being whether the person ever had custody of the juvenile, whether the juvenile stayed with or lived with the person for a considerable length of time, whether the person signed school paperwork, fed and clothed the juvenile, provided medical and other necessary care for the juvenile.
 

 19. Based upon the case law as interpreted by Attorney Webb and the facts of this case regarding the Uncle Jeremias Cruz and the defendant, Attorney Webb made the decision that Uncle Jeremias Crus would be the appropriate person under 7B-2101 and believed his interpretation of the law as it existed was correct. Attorney Webb therefore did not identify or raise at the suppression hearing any issues as to whether Jeremias Cruz was the parent, custodian, or guardian of Defendant. On direct appeal, the Court of Appeals determined that Jeremias Cruz was not the "guardian" of the defendant.
 

 20. Attorney Webb's file does not contain any copy of, nor any reference to, the Court of Appeals decision in the case of
 
 In re M.L.T.H
 
 . Given the existence of
 
 Oglesby
 
 , counsel was not under any duty to find the
 
 M.L.T.H.
 
 opinion or the
 
 dicta
 
 contained in a footnote of that opinion stating that
 
 Oglesby
 
 "imp[l]iedly" overruled
 
 Jones.
 
 The decision in
 
 M.L.T.H.
 
 was filed in November, 2009, and did not become final until 2010....
 

 21. ... the evidence does not establish that Attorney Webb read
 
 M.L.T.H.
 
 before the hearing on the motion to suppress. The court finds as a fact that Attorney Webb was mistaken in his belief that he had reviewed
 
 M.L.T.H.
 
 prior to the suppression hearing....
 

 *786
 
 22. At the time of the suppression hearing[,] Attorney Webb knew that Jeremias Cruz had assumed responsibility for the care and upbringing of the defendant. Attorney Webb conducted a preliminary review of the cases and the law relating to the issue of who could be a "parent, guardian or custodian" under the applicable statute, including the Supreme Court's decision in
 
 Oglesby
 
 . These cases were understood by Attorney Webb, in the reasonable exercise of his best professional judgment, to support the conclusion, which was consistent with the realities of defendant's actual living situation, that Jeremias Cruz was acting as defendant's "guardian" within the meaning of N.C. Gen. Stat. 7B-2101....
 

 ....
 

 25. Attorney Webb's representation of defendant, viewed at the time of counsel's representation, and not merely through hindsight, was objectively reasonable.
 

 The trial court then concluded that Attorney Webb did not provide ineffective assistance of counsel as counsel's performance was not deficient nor was defendant prejudiced. The trial court denied defendant's MAR; it is from this order and the denial of defendant's motion to suppress that defendant's appeal is now before us.
 

 II. MAR
 

 Defendant's argument on appeal is that the trial court erred when it denied his MAR because he did not receive ineffective assistance from his counsel when Attorney Webb failed to challenge his confession on the ground that an appropriate adult was not present during his interrogation.
 

 When considering rulings on motions for appropriate relief, we review the trial court's order to determine whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court. However, if the issues raised by Defendant's challenge to the trial court's decision to deny his motion for appropriate relief are primarily legal rather than factual in nature, we will essentially use a
 
 de novo
 
 standard of review in evaluating Defendant's challenges to the court's order.
 

 State v. Marino
 
 ,
 
 229 N.C. App. 130
 
 , 139-40,
 
 747 S.E.2d 633
 
 , 640 (2013) (citations, quotation marks, and brackets omitted).
 

 Defendant's MAR was based upon ineffective assistance of counsel, and thus we must also consider that standard.
 

 To obtain relief for ineffective assistance of counsel, the defendant must demonstrate initially that his counsel's conduct fell below an objective standard of reasonableness. The defendant's burden of proof requires the following:
 

 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
 

 The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
 

 State v. Quick
 
 ,
 
 152 N.C. App. 220
 
 , 222,
 
 566 S.E.2d 735
 
 , 737 (2002) (citations and quotation marks omitted).
 

 Defendant does not challenge the trial court's findings of fact regarding his relationship with his uncle but only its conclusions of law regarding ineffective assistance of counsel.
 
 [1]
 
 We must first consider whether Attorney
 
 *787
 
 Webb's representation "was deficient" in that he "made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment."
 
 Quick
 
 ,
 
 152 N.C. App. at 222
 
 ,
 
 566 S.E.2d at 737
 
 . At the time of defendant's interrogation in 2007, North Carolina General Statute § 7B-2101(b) provided that
 

 [w]hen the juvenile is less than 14 years of age, no in-custody admission or confession resulting from interrogation may be admitted into evidence unless the confession or admission was made in the presence of the juvenile's parent, guardian, custodian, or attorney. If an attorney is not present, the parent, guardian, or custodian as well as the juvenile must be advised of the juvenile's rights as set out in subsection (a) of this section; however, a parent, guardian, or custodian may not waive any right on behalf of the juvenile.
 

 N.C. Gen. Stat. § 7B-2101(b) (2007).
 

 Defendant's uncle was present when he was advised of his rights and interrogated. It is uncontested defendant's uncle was not his parent nor was he an attorney. The trial court and the briefs before us all focus on the term "guardian[,]" and it is uncontested that defendant's uncle was never appointed as defendant's guardian. But we instead will address the determinative term "custodian."
 

 In 2007, the year of the crime and defendant's statements to law enforcement officers, North Carolina General Statute § 7B-101(8) defined a "[c]ustodian" as "[t]he person or agency that has been awarded legal custody of a juvenile by a court
 
 or a person, other than parents or legal guardian, who has assumed the status and obligation of a parent without being awarded the legal custody of a juvenile by a court
 
 ."
 
 See
 
 N.C. Gen. Stat. § 7B-101(8) (2007) (emphasis added). Defendant was indicted in 2009, when North Carolina General Statute § 7B-101(8) remained the same as it was in 2007.
 
 See
 
 N.C. Gen. Stat. § 7B-101(8) (2009). The trial court heard defendant's motions to suppress in June and October of 2012, when the law was still unchanged. See N.C. Gen. Stat. § 7B-101(8) (2011). But shortly after defendant's guilty plea and judgment, the law changed:
 

 Session Laws 2013-129, s. 1, effective October 1, 2013, ... deleted 'court or a person, other than parents or legal guardian, who has assumed the status and obligation of a parent without being awarded the legal custody of a juvenile by a' preceding 'court' in subdivision (8).... For applicability, see editor's note.
 

 N.C. Gen. Stat. § 7B-101, Effects of Amendments (2013). The Editor's Note of North Carolina General Statute § 7B-101 provides that "Session Laws 2013-129, s. 41, made the amendment to this section by Session Laws 2013-129, s. 1, applicable to actions
 
 filed or pending on or after October 1, 2013
 
 ." N.C. Gen. Stat. § 7B-101, Editor's Note (2013) (emphasis added).
 

 Defendant's action was "filed" prior to 1 October 2013, so the question is when it ceased to be "pending." In our research we have not found a simple definition of when a criminal action is "pending[.]" Defendant's questioning by law enforcement, which is the subject of this appeal, occurred in 2007, but the indictment was filed in August of 2009.
 
 [2]
 
 Had defendant's case proceeded to trial in 2013, instead of being resolved by his guilty plea, there is a possibility that defendant's case could still have been "pending" in October of 2013. But defendant did plead guilty, so his prosecution at the trial court level ended in May of 2013, when judgment was
 
 *788
 
 entered. At that point, defendant's appeal began, and that appeal is still "pending."
 

 Though a criminal defendant may appeal or file post-conviction motions or petitions to this Court, our Supreme Court, or federal courts for decades to come, if charges are not dismissed, the judgment concludes the "pending" criminal action and after that, an appeal or review process may begin.
 
 See generally
 

 State v. Ward
 
 ,
 
 46 N.C. App. 200
 
 , 203,
 
 264 S.E.2d 737
 
 , 739 (1980) ("Ordinarily in North Carolina an appeal will only lie from a final judgment."). While a criminal defendant has no obligation to appeal or challenge his judgment, he will have to see his pending charges through to judgment.
 
 See generally
 

 id
 
 . In addition, the trial court can only apply the law as it exists when the trial court is considering a particular issue. Therefore we conclude entry of a criminal judgment ends a "pending" criminal action for purposes of North Carolina General Statute § 7B-101(8). If we concluded any later point in time, some actions may never cease to be "pending;" there would be no true finality to criminal cases.
 

 Defendant's judgment was entered in May of 2013. Defendant's action was no longer "pending" in October of 2013 and the amendment enacted by Session Laws 2013-129, s. 1 is not applicable to defendant.
 
 See
 
 N.C. Gen. Stat. § 7B-101, Editor's Note. Defendant's case is controlled by the definition of "custodian" as it existed from 2007 until the change in 2013. And particularly since defendant presents an issue of ineffective assistance of counsel, we cannot expect an attorney to foresee future changes to all statutes which may relate to a defendant's case. The attorney can only know and argue the law as it exists at that time. Here, the relevant law was the same at the time of the questioning in 2007, inception of the Superior Court prosecution in 2009, hearing on the defendant's motions to suppress in 2012, and entry of judgment in 2013.
 

 In the first appeal, this Court determined in an unpublished opinion that defendant's uncle was not his "custodian" citing "
 
 State v. Jones
 
 ,
 
 147 N.C. App. 527
 
 , 534,
 
 556 S.E.2d 644
 
 , 649 (2001) (holding that aunt was not 'custodian')."
 
 State v. Benitez
 
 ,
 
 238 N.C. App. 363
 
 ,
 
 768 S.E.2d 201
 
 (Dec. 31, 2014) (No. COA14-542) (unpublished) ("
 
 Benitez I
 
 ");
 
 vacated
 
 ,
 
 368 N.C. 350
 
 ,
 
 777 S.E.2d 60
 
 (2015). The reasoning in
 
 Benitez I
 
 implies that an aunt could never be a custodian simply by being an "aunt,"
 
 see
 

 id.
 

 , but nothing in the definition of custodian precludes an otherwise qualifying aunt from being a "custodian."
 
 See
 
 N.C. Gen. Stat. § 7B-101(8) (2007). And while
 
 State v. Jones
 
 cursorily stated that the defendant's aunt was not his "custodian," the entire analysis was based upon the term "guardian."
 
 See
 

 Jones
 
 ,
 
 147 N.C. App. 527
 
 ,
 
 556 S.E.2d 644
 
 (2001).
 
 Jones
 
 did not address whether the aunt could have been a "custodian" under the 2007 definition.
 
 See
 

 id.
 

 ;
 
 see also
 
 N.C. Gen. Stat. § 7B-101(8) (2007). Furthermore, in
 
 In re M.L.T.H.
 
 , this Court noted,
 

 The North Carolina Supreme Court in
 
 State v. Oglesby
 
 expressly held that a person in the position of a guardian could not be treated as a guardian for purposes of N.C. Gen. Stat. § 7B-2101, impliedly overruling
 
 State v. Jones
 
 .
 
 State v. Oglesby
 
 ,
 
 361 N.C. 550
 
 , 555-56,
 
 648 S.E.2d 819
 
 , 822 (2007).
 

 In re M.L.T.H.
 
 ,
 
 200 N.C. App. 476
 
 , 487 n.6,
 
 685 S.E.2d 117
 
 , 124, n.6 (2009). Therefore, because
 
 Benitez I
 
 was vacated, and the case it relied upon,
 
 Jones
 
 , has been "impliedly overrul[ed],"
 
 see
 

 id.
 

 , we are neither bound by nor persuaded by those cases to determine whether defendant's uncle was his "custodian." We thus turn to the case law which addresses the definition of "custodian" as it existed in the time period relevant to defendant, when defendant claims his counsel should have moved to suppress based upon North Carolina General Statute § 7B-2101(b).
 

 In
 
 In re A.P.
 
 , this Court explained,
 

 N.C. Gen. Stat. § 7B-101(8) (2003) defines a custodian as the person or agency that has been awarded legal custody of a juvenile by a court or a person, other than parents or legal guardian, who has assumed the status and obligation of a parent without being awarded the legal custody of a juvenile by a court. There is no question that respondent has not been awarded legal custody of the children.
 

 *789
 
 However,
 
 the analysis must focus on whether respondent qualifies as one who has assumed the status and obligation of a parent without being awarded the legal custody of the children.
 

 165 N.C. App. 841
 
 , 843,
 
 600 S.E.2d 9
 
 , 11 (2004) (emphasis added) (quotation marks and brackets omitted). The paternal step-grandfather of the children in
 
 A.P.
 
 claimed to be a custodian because "(1) ... he and his wife were listed on the petitions as parents, guardian, custodian, or caretaker and (2) that he was served with a petition and summons regarding the alleged neglect of each child."
 

 Id.
 

 (quotation marks omitted).
 

 This Court disagreed and undertook a thorough explanation of § 7B-101(8), which we will quote at length because the facts of the potential custodian's relationship with and care of the juvenile are an important part of the court's analysis:
 

 [W]e do not find that he was the custodian of the children simply because he and his wife were listed on the petitions. Rather, a juvenile petition sets forth the names of persons who fit within any one of four categories, including parent, guardian, custodian, and caretaker. A petition also designates the relationship or title each listed person has with respect to the child or children involved. In the petitions at issue, J.P. and J.P. were named as mother and father. B.H. and respondent were also named in the petitions. However, they were designated simply as paternal grandmother and paternal step-grandfather. The fact that respondent and his wife were not deemed custodians in the petitions is evidence indicating they were listed simply because they fulfilled the role of caretakers. Further evidence that respondent was merely a caretaker is the fact that respondent's attorney submitted a report to the trial court on 22 January 2003 on behalf of respondent titled Report to the Court on behalf of Caretaker Respondent. This report stated that Respondent and his wife have had A.P. in their home often throughout her life and have an established relationship with A.P. as primary caretakers. If, in fact, respondent qualified only as a caretaker, N.C. Gen. Stat. § 7B-1002 does not grant him a right to appeal.
 

 In further support of respondent's claim to being custodian of the children, he stressed the 12 September 2002 report of the guardian ad litem which stated that the children are in custody of their paternal Grandmother and paternal Grand Step-father. Again, we do not find this argument persuasive. This report referred to the children being in the custody of their grandparents and was simply the guardian ad litem's way of specifying where the children were physically located. The use of the term custody in the guardian ad litem's report does not establish respondent's legal status with respect to the children.
 

 We note that over time the definition of custodian has undergone changes. Under N.C. Gen. Stat. § 7A-278(7) (1969), custodian was defined as a person or agency that has been awarded legal custody of a child by a court, or a person other than parents or legal guardian who stands in loco parentis to a child. Subsequently, the General Assembly narrowed the definition and limited custodian to only the person or agency that has been awarded legal custody of a juvenile by a court. However,
 
 the definition was again changed, effective 27 October 1998, and broadened to include, in addition to one who had been awarded legal custody, a person, other than parents or legal guardian, who has assumed the status and obligation of a parent without being awarded the legal custody of a juvenile by a court. It is this version of the definition that is presently in effect. See N.C. Gen. Stat. § 7B-101(8).
 

 Cases interpreting N.C. Gen. Stat. § 7A-278(7) have stated that the term in loco parentis means in the place of a parent, and a person in loco parentis may be defined as one who has assumed the status and obligations of a parent without a formal adoption. Thus, the current definition of custodian and the 1969 version essentially have the same meaning.
 

 The concept of in loco parentis has been addressed in the context of whether parental immunity exists in tort actions. For
 
 *790
 
 example,
 
 Liner v. Brown
 
 ,
 
 117 N.C. App. 44
 
 ,
 
 449 S.E.2d 905
 
 (1994),
 
 disc. review denied and cert. denied
 
 ,
 
 340 N.C. 113
 
 ,
 
 456 S.E.2d 315
 
 (1995) involved the issue of whether the defendants stood in loco parentis to a child who drowned in their swimming pool. In that case, our Court analyzed the meaning of in loco parentis and stated that a person does not stand in loco parentis from the mere placing of a child in the temporary care of other persons by a parent or guardian of such child. Rather,
 
 this relationship is established only when the person with whom the child is placed intends to assume the status of a parent-by taking on the obligations incidental
 

 *791
 

 to the parental relationship, particularly that of support and maintenance
 
 .
 

 In the case before us, A.P. was initially placed with respondent and B.H. around 11 March 2002 after A.P.'s mother reported that she had been forced out of the home by A.P.'s father. About a month later, both parents signed case plans agreeing to participate in parenting classes. A.P.'s father also agreed to participate in substance abuse classes and to maintain stable housing and employment. In addition, A.P.'s mother agreed to follow up with therapy and maintain stable housing and employment.
 
 The fact that both parents signed a case plan and made commitments to participate in programs is evidence that they did not intend for A.P. to remain with respondent and B.H. indefinitely. Rather, A.P.'s placement was viewed as more of a temporary arrangement.
 

 When S.P. was born in May 2002, she remained with her parents because DSS thought the parents had made progress. However, the parents began having problems, and on 13 August 2002, respondent and B.H. signed a kinship agreement in which they agreed to provide placement for S.P. In orders entered 23 October 2002 and 18 November 2002, the trial court ordered that temporary custody of the children remain with DSS. In addition, DSS was given discretion for placement of the children, including, but not limited to the home of respondent and B.H. After allegations of sexual abuse, the children were moved from respondent's home to foster care on 12 November 2002.
 

 The evidence does not indicate that respondent and B.H. assumed the role and status of parents to the children. First, the children spent only a relatively short amount of time with respondent and B.H. before they were moved to foster care. The evidence shows that A.P. lived with respondent and B.H. for approximately eight months while S.P. lived with them for only about three months. Second, the children were not simply abandoned by their parents. Rather, when A.P. was first placed with respondent and B.H., her parents made efforts to improve parenting skills, to maintain a suitable environment for her, and to restore the parent-child relationship. Similarly, the parents made efforts regarding S.P. until the kinship agreement was signed. Thus, we conclude that the children were merely placed in the temporary care of respondent and B.H. Under Liner, such placement does not warrant the conclusion that respondent was standing in loco parentis to the children.
 

 165 N.C. App. at 844-46
 
 ,
 
 600 S.E.2d at 11-13
 
 (emphasis added) (citations, quotation marks, and brackets omitted).
 

 In
 
 In re T.B.
 
 , this Court "determine[d] whether Respondent acted as custodian by assuming the status and obligation of a parent without being awarded the legal custody of a juvenile by a court. N.C. Gen. Stat. § 7B-101(8)."
 
 In re T.B.
 
 ,
 
 200 N.C. App. 739
 
 , 744,
 
 685 S.E.2d 529
 
 , 533 (2009) (quotation marks and brackets omitted). This Court explicitly relied on
 
 A.P.
 
 , and stated that its determination
 

 involves deciding whether a person has acted in loco parentis to the child in question. As this Court has stated:
 

 A person does not stand in loco parentis from the mere placing of a child in the temporary care of other persons by a parent or guardian of such child. This relationship is established only when the person with whom the child is placed intends to assume the status of a parent-by taking on the obligations incidental to the parental relationship, particularly that of support and maintenance.
 

 In
 
 In re A.P.
 
 , this Court held that the Respondent paternal step-grandfather was not an appropriate party to appeal from a permanency planning order. Several factors were noted: (1) the fact that the step-grandfather's name was listed on the juvenile petition as a parent, guardian, custodian, or caretaker was not dispositive; (2) the child's parents remained involved or were attempting to remain involved in the child's life, meaning that the placement with the step-grandfather was considered temporary; (3) the child was placed with the step-grandfather for only one month before the child's parents signed case plans with DSS, and the child only spent a total of eight months in the Respondent's care; (4) although the Respondent signed a kinship agreement several months after assuming care of the child, temporary custody remained with DSS; and (5) the step-grandfather was not explicitly made a party to any custody action beyond being listed on the juvenile petition. Despite the fact that this Court in
 
 In re A.P.
 
 acknowledged that the Respondent was a caretaker, and in fact the primary caretaker, of the child,
 
 this Court determined that the temporary nature of the care meant that the Respondent did not act in loco parentis to the child
 
 . The appeal was dismissed for lack of standing.
 

 In the instant case, DSS and the GAL argue that Respondent's unauthorized decision to return T.B. to his mother demonstrates her lack of intent to assume the status and obligation of a parent. They further argue that T.B. was out of Respondent's care for at least six months while these proceedings advanced, and that Respondent failed to attend the disposition hearing. Petitioner contends these facts show that Respondent was merely a caretaker and not interested in assuming a parental role for T.B. After careful review, we conclude that the record is insufficient to establish whether Respondent was a custodian such that she has standing to pursue this appeal.
 

 There is little information provided regarding the extent of and the periods that Respondent provided care for T.B. It appears that T.B. may have lived with Respondent from some time in 2005 for an unknown duration, and that Respondent had at least some responsibility for the child. T.B. also spent a great deal of time with his paternal grandparents, the Fords. The GAL report dated 29 January 2009 stated that the Fords shared parenting responsibility with Respondent. GAL Jean Barbour testified at the disposition hearing that T.B. lived with Respondent and with the Fords, and that they shared in the caretaking of him. When asked whether Respondent was T.B.'s primary caretaker and whether T.B. resided principally with Respondent, Barbour responded, well, I don't know the answer to that. He resided with both of them. They shared caretaking responsibility of him. There is no evidence of Respondent's level of support and maintenance in caring for T.B., or whether it was Respondent or the Fords who took T.B. to medical appointments or provided for other needs, etc.
 

 Unlike
 
 In re A.[P].
 
 , there is no evidence about any involvement that either of T.B.'s parents might have had with T.B. during the period he lived with Respondent. T.B.'s mother did not sign a case plan until after T.B. was removed from Respondent's care in the autumn of 2008. It is also unclear the level of involvement by DSS during the time T.B. lived with Respondent and whether any steps were taken to attempt to reunify T.B. with either of his parents. We conclude that there is no evidence that would clarify whether T.B.'s living arrangement with Respondent was intended to be temporary or permanent or its duration.
 

 In
 
 In re A.P.
 
 , this Court determined that the step-grandfather was merely a caretaker and not a custodian of the minor child. In the case sub judice, it appears that Respondent's care and supervision of T.B. was more involved than that of the Respondent in
 
 In re A.P
 
 . However, Respondent has failed to demonstrate to this Court that she had been awarded legal custody of T.B., that she was his custodian,
 
 *792
 
 and the duration of either status. Therefore, given the absence of court orders establishing Respondent's legal status with respect to T.B., and the lack of evidence presented as to Respondent's level of care and support of T.B. or of the participation of T.B.'s parents and DSS in T.B.'s life, and Respondent's return of T.B. to his mother, we are unable to conclude that Respondent's actions are consistent with one who assumes the status and obligation of a parent such that she was a custodian for purposes of N.C. Gen. Stat. § 7B-1002(4).
 

 ....
 

 We conclude that Respondent has failed to meet her burden demonstrating that she has standing to pursue this appeal as a custodian of the child and that she was the non-prevailing party. Accordingly, we dismiss the appeal.
 

 Id.
 
 at 744-46, 685 S.E.2d at 533-34 (emphasis added) (citations, quotation marks, and brackets omitted).
 

 We consider whether defendant's uncle intended "to assume the status of a parent-by taking on the obligations incidental to the parental relationship, particularly that of support and maintenance."
 
 In re A.P.
 
 ,
 
 165 N.C. App. at 845
 
 ,
 
 600 S.E.2d at 12
 
 . As directed by the Supreme Court on remand, the trial court considered evidence on defendant's relationship with his uncle and his uncle's care for defendant. The trial court made these uncontested findings of fact:
 

 4. Defendant's Uncle, Jeremias Cruz, advised Mr. Webb that the defendant was Mr. Cruz's sister's son, and that by agreement with defendant's mother, the defendant had lived with him ever since the defendant came to North Carolina from El Salvador; for approximately 1 ½ years before the defendant was arrested. Defendant has no parent, custodian or guardian other than Jeremias Cruz living in the United States.
 

 5. Mr. Cruz provided the sole support for the defendant, had provided the defendant with his own room in Mr. Cruz's house, provided food for the defendant, provided clothing for the defendant, provided medical care for the defendant, enrolled the defendant in the Lee County School system and had otherwise provided all the needs of a juvenile the defendant's age.
 

 6. Attorney Webb had learned from the conferences with Mr. Cruz and with the defendant that Mr. Cruz had provided all the above referenced care for the defendant and had been accepted as a guardian by the Lee County School system to enroll the defendant in school.
 

 7. Attorney Webb had obtained documentation from the Lee County School and Lee County Health Department showing that Mr. Cruz had appeared before each of these entities and been accepted as the guardian of the defendant Juan C. Benitez.
 

 8. Mr. Cruz considered himself to have legal custody of the defendant since he had sole physical custody of the defendant by agreement with his sister and Mr. Cruz had advised others including Detective Brandon Wall on the day the defendant was arrested before the interview of defendant, that he was the defendant's uncle, that the defendant lived with him ..., that he was defendant's legal guardian or custodian and Juan had lived with him for about a year and a half and Mr. Webb had seen this in discovery provided by the State.
 

 9. The defendant's uncle Jeremias Cruz signed or was listed as a parent or guardian on numerous documents some of which are dated January 2006; those documents were obtained and received by Attorney Webb.
 

 10. Jeremias Cruz had taken the defendant to the Lee County Health Department for vaccinations and Attorney Webb had reviewed the documents confirming that Jeremias Cruz was accepted as guardian by the Lee County Health Department.
 

 11. Jeremias Cruz was the sole support for the defendant and the only person that the defendant had resided with since he arrived in North Carolina, and Attorney Webb had confirmed this
 
 *793
 
 through interviews with the uncle and the defendant.
 

 The findings of fact demonstrate that defendant's uncle intended to and did "assume the status of a parent-by taking on the obligations incidental to the parental relationship, particularly that of support and maintenance[,]"
 

 id.
 

 , and that the arrangement with defendant's uncle was not temporary.
 
 See generally
 

 In re T.B.
 
 , 200 N.C. App. at 745, 685 S.E.2d at 533. Defendant's uncle acted in
 
 loco parentis
 
 to defendant,
 
 see generally
 

 id
 
 . at 744-46, 685 S.E.2d at 533-34 ;
 
 In re A.P.
 
 ,
 
 165 N.C. App. at 844-46
 
 ,
 
 600 S.E.2d at
 
 11-13 ; he was defendant's custodian,
 
 see
 
 N.C. Gen. Stat. § 7B-101(8), so defendant's rights under North Carolina General Statute § 7B-2101(b) were not violated.
 
 See
 
 N.C. Gen. Stat. § 7B-2101(b). Therefore, Attorney Webb did not provide ineffective assistance of counsel in failing to move to suppress defendant's statement based upon North Carolina General Statute § 7B-2101(b), and thus defendant's MAR was properly denied. Defendant's arguments are overruled.
 

 III. Motion to Suppress
 

 Because defendant did not prevail on his current appeal of his MAR and the Supreme Court left the jurisdiction of this Court open to consider defendant's original appeal of his motion to suppress, we now turn to that appeal. We also turn back to defendant's 2014 brief and his reply brief for the basis of his argument regarding the denial of his motion to suppress. Defendant did file a supplemental brief and a supplemental reply brief in 2016, but the focus of those briefs is the second appeal regarding the MAR.
 

 Defendant made three arguments in his 2014 briefs in the appeal of his motion to suppress. Most of defendant's brief was devoted to his primary argument regarding violation of his rights under North Carolina General Statute § 7B-2101(b), but we have already addressed that argument in relation to the trial court's order on remand for the MAR. Defendant's second argument was that "the trial court erred by denying ... [defendant's] motion to suppress his statement at the Lee County Sheriff's Department because his waiver of right was not knowing and intelligent." (Original in all caps.) Defendant's third argument is related to the second: in the alternative, he contends that "the trial court erred by failing to make findings of fact to resolve material conflicts in the evidence" regarding whether defendant "knowingly and intelligently waived his rights." (Original in all caps.) Since both of defendant's remaining arguments address the trial court's findings of fact regarding knowing and voluntary waiver and the sufficiency of the evidence to support those findings, we will address them together.
 

 To determine if a defendant has "knowingly and voluntarily" waived his right to remain silent, the trial court must consider the totality of the circumstances of the interrogation, and for juveniles, this analysis includes the "juvenile's age, experience, education, background, and intelligence, and [evaluation] into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights":
 

 [T]he determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel.
 

 This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits-indeed, it mandates-inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.
 

 *794
 

 Fare v. Michael C.
 
 ,
 
 442 U.S. 707
 
 , 724-25,
 
 99 S.Ct. 2560
 
 , 2571-72,
 
 61 L.Ed.2d 197
 
 , 212 (1979) (citations and quotation marks). Defendant argues that the trial court failed to make sufficient findings of fact to address the factors required by the "totality-of-the-circumstances approach" mandated by the United States Supreme Court.
 

 Id.
 

 at 725
 
 ,
 
 99 S.Ct. at 2571-72
 
 ,
 
 61 L.Ed.2d at 212
 
 . This approach requires "inquiry into all of the circumstances surrounding the interrogation" and "evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given to him, the nature of his Fifth Amendment rights, and the consequences of waiving these rights."
 

 Id.
 

 Furthermore,
 

 A child's age is far more than a chronological fact. It is a fact that generates commonsense conclusions about behavior and perception. Such conclusions apply broadly to children as a class. And, they are self-evident to anyone who was a child once himself, including any police officer or judge.
 

 Time and again, this Court has drawn these commonsense conclusions for itself. We have observed that children generally are less mature and responsible than adults; that they often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them; that they are more vulnerable or susceptible to outside pressures than adults. Addressing the specific context of police interrogation, we have observed that events that would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. Describing no one child in particular, these observations restate what any parent knows-indeed, what any person knows-about children generally.
 

 J.D.B. v. North Carolina
 
 ,
 
 564 U.S. 261
 
 , 272-73,
 
 131 S.Ct. 2394
 
 , 2403-04,
 
 180 L.Ed. 2d 310
 
 , 323-24 (2011) (citations, quotation marks, and ellipses omitted).
 

 Defendant does not challenge any of the trial court's findings of fact in the order denying his motion to suppress, so all of its findings are binding on appeal.
 
 See
 

 State v. Osterhoudt
 
 ,
 
 222 N.C. App. 620
 
 , 626,
 
 731 S.E.2d 454
 
 , 458 (2012) ("Any unchallenged findings of fact are deemed to be supported by competent evidence and are binding on appeal." (citation and quotation marks omitted)). As to binding findings of fact, we must note at the outset that defendant's competency to stand trial was an issue in this case; ultimately, in 2012, the trial court entered an order determining defendant was competent to stand trial. In addition, all of the testimony and evidence from the competency hearing was also admitted for purposes of the hearing on the motion to suppress which is at issue in this appeal. The competency order found:
 

 3. That the Defendant does suffer from a mental illness or defect however there is insufficient evidence with respect to the requirement of adaptive functioning to determine the exact nature of that mental illness or defect as regard to those prongs of the test for mental retardation.
 

 4. The Court further finds that based upon testimony of Brian David, a supervisor at the Richmond Detention Center that the Defendant gets along well with the other inmates, communicates well, and serves as a Trustee at the facility.
 

 5. That the Defendant has shown the ability to respond in a reasonable and rational manner to questions regarding the proceedings, and the Defendant[']s situation, and the ability to assist defense counsel.
 

 At the time of the competency order, defendant would have been 18 years old and thus an adult, but he was 13 at the time of the interrogation, so the determination of defendant's competency has little weight in the analysis of defendant's knowing and intelligent waiver at age 13.
 
 [3]
 
 So the finding
 
 *795
 
 that defendant "suffer[s] from a mental illness or defect" but does not meet the "test for mental retardation" is a relevant finding of fact which we cannot ignore when reviewing the denial of defendant's motion to suppress based upon a knowing and intelligent waiver of his rights.
 
 [4]
 

 Based upon the record and the extensive evaluations of defendant, it appears defendant's "mental illness or defect" existed since before defendant was age 18 and the "mental illness or defect" is relevant to any consideration of his "experience, education, background, and intelligence, and ... whether he has the capacity to understand the warnings given to him, the nature of his Fifth Amendment rights, and the consequences of waiving these rights."
 
 Fare
 
 ,
 
 442 U.S. at 725
 
 ,
 
 99 S.Ct. at 2571-72
 
 ,
 
 61 L.Ed.2d at 212
 
 . The competency order's finding did not identify the "mental illness or defect" or describe its impact upon defendant's abilities or understanding but seems only to have determined that defendant did not meet "the test for mental retardation."
 

 Much of the order denying defendant's motion to suppress is devoted to law enforcement's initial encounters with defendant, leading up to his "transfer" to the Sheriff's Office. As to the interrogation, the order then finds:
 

 12. Lee County Detective Clint Babb met with Defendant's Uncle Jeremiah Cruz who was the Defendant's custodian, the Defendant, and Spanish interpreter Celinda Carney at the Lee County Sheriff's Office.
 

 13. The Defendant who was 13 years old at the time was duly advised of his juvenile rights in the presence of his uncle and the juvenile rights were interpreted by Celinda Carney. Celinda Carney was retained by the Lee County Sheriff's Office to assist them with interpreting in this matter. Celinda Carney had never interpreted in a criminal matter before.
 

 14. Detective Babb and Ms. Carney testified the Defendant understood all questions asked and Defendant responded appropriately to all questions.
 

 15. The Defendant acknowledged he understood each right read to him and initialed each one to indicate he understood each item as shown on the rights form admitted to evidence.
 

 16. The Defendant agreed to waive his rights and signed the waiver indicating same. Neither Defendant nor [hi]s uncle at anytime indicated any lack of understanding of what was being said.
 

 17. The Defendant began responding to questions and at some point advised Detective Babb through the interpreter Ms. Carney that he would tell Ms. Carney what happened but not Detective Babb.
 

 18. Detective Babb advised Ms. Carney to tell the Defendant whatever he told Ms. Carney she was going to tell Detective
 
 *796
 
 Babb and Ms. Carney did so and the Defendant agreed to tell her anyway. Detective Babb left the interview room leaving the Defendant with Ms. Carney.
 

 19. Defendant told Ms. Carney the information contained in his written signed statement after Detective Babb left the room and she relayed same to Detective Babb as she indicated she would.
 

 20. Detective Babb went over what the Defendant told Ms. Carney with the Defendant and Defendant agreed that it was correct.
 

 21. The Defendant told the same story again in the computer room, Defendant was read the statement again from the computer screen and Ms. Carney read the statement to the Defendant in printed form, and the defendant acknowledged the statement as accurate and signed it, and the Defendant's uncle was present with him throughout the process.
 

 22. Each witness indicated that the Defendant was never threatened, coerced or otherwise harassed and all conversations were done in a conversational tone without yelling.
 

 23. None of the witnesses in the presence of the Defendant from the point of contact with the Defendant saw any signs of the Defendant being confused or otherwise not understanding what was being asked or instructed.
 

 The findings of fact in the motion to suppress
 
 do
 
 address defendant's age and "the circumstances surrounding the interrogation[,]" but not defendant's "experience, education, background, and intelligence" or "whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."
 

 Id.
 

 The absence of findings regarding defendant's "experience, education, background, and intelligence" and "capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights[,]"
 
 id
 
 ., is especially concerning since the trial court had already found defendant suffers from an unnamed "mental illness or defect" and had before it "all of [the] testimony and evidence" from the competency hearing, including an evaluation from Dr. Antonio Puente in 2008 when defendant was only 14 years old. Dr. Puente's evaluation was the first done, when defendant was not much older than at the time of the interrogation. Dr. Puente found "the diagnosis is mild retardation with organic deficits limiting his ability to understand and appreciate the complexities involved with the alleged incident, as well as his own legal situation." Dr. Puente also did a follow-up evaluation in 2011, again diagnosing defendant with "Mild Mental Retardation." Because all of the testimony and evaluations presented at the competency hearing were included as part of the evidence for the hearing on the motion to suppress, the trial court had before it
 
 extensive
 
 evidence regarding defendant's "experience, education, background, and intelligence" and "capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."
 

 Id.
 

 The trial court must evaluate the evidence, consider its weight, and make the required findings, but here it simply did not.
 
 See generally
 

 id.
 

 ,
 
 442 U.S. at 724-25
 
 ,
 
 99 S.Ct. at 2571-72
 
 ,
 
 61 L.Ed.2d at 212
 
 .
 

 This case has gone on for a long time. When it started, defendant was a 13 year old child. When defendant entered his plea, he was nearing his 20
 
 th
 
 birthday. At the time of the filing of this opinion, defendant is 24 years old. Nonetheless, we must remand for the trial court to make additional findings of fact addressing whether defendant's waiver of rights
 
 at age 13
 
 was knowing and intelligently made, taking into account the evidence regarding defendant's "experience, education, background, and intelligence" and evaluation of "whether he has the capacity to understand the warnings given to him, the nature of his Fifth Amendment rights, and the consequences of waiving these rights."
 

 Id.
 

 These considerations under
 
 Fare
 
 are not technicalities but are essential to any conclusion of whether defendant knowingly and intelligently waived his right to remain silent.
 
 See generally
 
 id.
 

 The trial court's order did not properly address the constitutional arguments
 
 *797
 
 before it in defendant's motion to suppress, and thus remand is necessary at this late stage in defendant's ongoing criminal proceedings. Certainly the trial court may consider later evaluations and events in its analysis of defendant's knowing and intelligent waiver at age 13 but should take care not to rely too much on hindsight. Hindsight is reputed to be 20/20, but hindsight may also focus on what it is looking for to the exclusion of things it may not wish to see. The trial court's focus must be on the relevant time period and defendant's circumstances at that time as a 13 year old boy who required a translator and who suffered from a "mental illness or defect" and not on the 10 years of litigation of this case since that time. The trial court must make findings as to defendant's mental state and capacity to understand the
 
 Miranda
 
 warnings at age 13, including the nature of his "mental illness or defect[,]" and the impact, if any, this condition had on his ability to make a knowing and intelligent waiver.
 
 See generally
 
 id.
 

 IV. Conclusion
 

 Because while this action was pending in the trial court, and particularly when the issue of admission of evidence of defendant's statement could have been considered by the trial court, defendant's uncle was his "custodian," defendant's rights under North Carolina General Statute § 7B-2101(b) were not violated. The amendment to North Carolina General Statute § 7B-101(8), which redefined the term "custodian," was not applicable to defendant's case. Therefore, defendant's attorney did not provide ineffective assistance of counsel in failing to make an argument under North Carolina General Statute § 7B-2101(b). The trial court properly denied defendant's MAR, and we affirm the order denying defendant's MAR.
 

 Because the trial court failed to address the key considerations in determining whether defendant had knowingly and intelligently waived his rights during police interrogation, we must remand the order denying defendant's motion to suppress for further findings of fact. We note that both the State and defendant have already presented evidence regarding these issues, but if either the State or defendant should request that the trial court allow presentation of further evidence or argument on remand, the trial court may in its sole discretion either allow or deny this request.
 

 AFFIRMED in part; REMANDED in part.
 

 Chief Judge McGEE and Judge TYSON concur.
 

 [1]
 

 Defendant's brief does mention three findings of fact made in the order denying defendant's motion to suppress, regarding whether defendant knowingly and intelligently waived his rights, and we will address those findings of fact as necessary in the portion of this opinion addressing the motion to suppress. Defendant then extends his argument regarding the order denying his motion to suppress by claiming that order was not sufficient, and thus on remand the trial court should have made more factual findings addressing the insufficiency of that order. But the trial court did not have jurisdiction on remand to reconsider defendant's motion to suppress and any "insufficienc[ies]" in it. The Supreme Court specifically remanded to the trial court for consideration of the MAR. The Supreme Court also tolled the time of appeal of the motion to suppress based upon the determination made in the MAR. Thus, ultimately, the trial court only had jurisdiction to address the MAR while this Court has both the jurisdiction to address the original appeal of the motion to suppress and the MAR now appealed.
 

 [2]
 

 Defendant was initially under the jurisdiction of the District Court as a juvenile before the case was transferred to Superior Court pursuant North Carolina General Statute § 7B-2203 on 22 July 2009 in order to try him as an adult.
 

 [3]
 

 Defendant devotes a substantial part of his argument to the background of his competency evaluation leading up to the hearing and order regarding his competency to stand trial, but we will not address this in detail. The competency order was not appealed and in the suppression order on appeal, the trial court was considering a different question. It does not appear the trial court heavily relied on the competency order in its order denying defendant's motion to suppress, but even if it did rely in part on the competency order, neither order addressed defendant's "experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given to him, the nature of his Fifth Amendment rights, and the consequences of waiving these rights" at the time of the interrogation when he was 13.
 
 Fare
 
 ,
 
 442 U.S. at 725
 
 ,
 
 99 S.Ct. at 2571-72
 
 ,
 
 61 L.Ed.2d at 212
 
 .
 

 [4]
 

 To be accurate we have used the terminology as used in the record of this case, but we note that the terminology used by mental health professionals for mental retardation has changed since the 2012 order was entered. The United State Supreme Court noted in 2014 that "[p]revious opinions of this Court have employed the term "mental retardation." This opinion uses the term "intellectual disability" to describe the identical phenomenon. See Rosa's Law,
 
 124 Stat. 2643
 
 (changing entries in the U.S. Code from "mental retardation" to "intellectual disability"); Schalock et al., The Renaming of
 
 Mental Retardation
 
 : Understanding the Change to the Term
 
 Intellectual Disability
 
 , 45 Intellectual & Developmental Disabilities 116 (2007). This change in terminology is approved and used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders, one of the basic texts used by psychiatrists and other experts;" the manual is often referred to by its initials "DSM," followed by its edition number,
 
 e.g.
 
 , "DSM-5." See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013)."
 
 Hall v. Florida
 
 , 572 U.S. ----, ----,
 
 134 S.Ct. 1986
 
 , 1990,
 
 188 L.Ed.2d 1007
 
 , 1014 (2014).